**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

VERNON W. HILL, II,                              :
262 E. Main Street                                 :
Moorestown, NJ  08057                          :
                                                                :
SHIRLEY HILL,                                      :
262 E. Main Street                                 :
Moorestown, NJ  08057                          :
                                                                :
INTERARCH, INC., a New Jersey Corporation,  :
11000 Atrium Way, Ste 100                    :
Mount Laurel, NJ  08054                        :
                                                                :   Civil Action  No. _____
              Plaintiffs,                               :
                                                                :
vs.                                                            :   COMPLAINT AND JURY DEMAND
                                                                :
DENNIS M. DIFLORIO,                          :
Commerce Atrium                                   :
1701 Route 70 East                                 :
Cherry Hill, NJ  08034                           :
                                                                :
JACK R. BERSHAD,                               :
Commerce Atrium                                   :
1701 Route 70 East                                 :
Cherry Hill, NJ  08034                           :
                                                                :
DONALD T. DIFRANCESCO,                  :
Commerce Atrium                                   :
1701 Route 70 East                                 :
Cherry Hill, NJ  08034                           :
                                                                :
ROBERT D. FALESE,                             :
Commerce Atrium                                   :
1701 Route 70 East                                 :
Cherry Hill, NJ  08034                           :
                                                                :
MORTON N. KERR,                               :
Commerce Atrium                                   :
1701 Route 70 East                                 :
Cherry Hill, NJ  08034                           :
                                                                :

JOSEPH BUCKELEW,                         :
Commerce Atrium                          :
1701 Route 70 East                       :
Cherry Hill, NJ  08034                   :
                                         :
JOHN K. LLOYD,                           :
Commerce Atrium                          :
1701 Route 70 East                       :
Cherry Hill, NJ  08034                   :
                                         :
GEORGE E. NORCROSS, III,                 :
Commerce Atrium                          :
1701 Route 70 East                       :
Cherry Hill, NJ  08034                   :
                                         :
DANIEL J. RAGONE,                        :
Commerce Atrium                          :
1701 Route 70 East                       :
Cherry Hill, NJ  08034                   :
                                         :
WILLIAM A. SCHWARTZ, JR.,                :
Commerce Atrium                          :
1701 Route 70 East                       :
Cherry Hill, NJ  08034                   :
                                         :
JOSEPH S. VASSALLUZZO,                   :
Commerce Atrium                          :
1701 Route 70 East                       :
Cherry Hill, NJ  08034                   :
                                         :
SCOTT HITE,                              :
Commerce Atrium                          :
1701 Route 70 East                       :
Cherry Hill, NJ  08034                   :
                                         :
COMMERCE BANCORP, INC.,                  :
a New Jersey Corporation,                :
Commerce Atrium                          :
1701 Route 70 East                       :
Cherry Hill, NJ  08034                   :
                                         :
COMMERCE BANK, N.A.,                     :
a Pennsylvania Corporation,              :
Commerce Atrium                          :

1701 Route 70 East                          :
Cherry Hill, NJ  08034,                      :
                                             :
        Defendants.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Plaintiffs Vernon W. Hill, II ("Mr. Hill"), Shirley Hill ("Mrs. Hill"), and

InterArch, Inc. ("InterArch"), by way of Complaint against the Defendants, say:

## NATURE OF THE ACTION

       1.     This is an action by Plaintiffs for:  (1) payment of damages arising from

the breach of an employment contract and a services contract by Defendants and for other

injuries the Defendants inflicted upon Plaintiffs' contractual, economic, and other interests; (2)

for indemnification and reimbursement of expenses against Commerce, pursuant to its

contractual obligations; (3) for payment of damages against the director Defendants for conduct

undertaken jointly with a federal regulator under color of federal law in violation of Plaintiffs'

constitutional rights; and (4) an injunction and damages arising out of violation of the federal

copyright laws.  Because of the wrongful conduct by Defendants, Plaintiff Vernon Hill has

suffered damages in excess of $50,000,000, and Plaintiffs Shirley Hill and InterArch have

suffered damages in excess of $7,500,000.

       2.     Mr. Hill founded Commerce Bancorp, Inc. ("the Holding Company" or

"Commerce Bancorp") in 1973 with a single branch in Marlton, New Jersey.  Over the past 34

years, Mr. Hill built the Holding Company into one of the largest and most successful regional

banks in the United States and the largest bank holding company still headquartered in New

Jersey. Today, Commerce Bank, N.A. ("CB" or "the Bank"), a wholly-owned subsidiary of the Holding Company, operates more than 425 branches throughout the East Coast, serves more than 2.4 million customers, and employs approximately 15,000 persons.

3.    During the 34 years Mr. Hill led the Bank and the Holding Company (collectively "Commerce"), the Bank expanded its network of branches exponentially.  On a small number of new branch transactions, the Bank worked in partnership with real estate developers, including development firms in which Mr. Hill had a financial interest.  Mr. Hill's financial interests in those affiliated-party transactions were the subject of disclosure to the Board of Directors of the Holding Company and the Holding Company's shareholders, as well as to the principal regulators of CB and the Holding Company—the Office of the Comptroller of the Currency ("OCC") and the Board of Governors of the Federal Reserve (the "Fed").

4.    Mrs. Hill founded InterArch, a full-service architectural and design firm, in 1973.  Over the past 35 years, InterArch has provided extensive services to Commerce including, but not limited to, interior design, exterior design, space planning, move coordination, and landscape design.  During that time, InterArch has become nationally and internationally renowned for its design and brand developments for Commerce.  The role of InterArch and Mrs. Hill in Bank transactions was the subject of disclosure to the Board of Directors of the Holding Company, as well as to the OCC and the Fed.

5.    Indeed, Commerce and the banking regulators have been monitoring the affiliated-party transactions and relationships at Commerce since 1975.  Notably, OCC regulations and guidelines expressly permit affiliated-party transactions.  As stated in the Insider

Activities Comptroller's Handbook published by the OCC, "Transactions between a bank and its insiders can address legitimate banking needs and serve the interests of both parties."

6.    At no time during this period have the banking regulators issued any finding that the above-described activities of Mr. Hill, Mrs. Hill, or InterArch violated any laws or regulations.  Indeed, upon information and belief, from 2002 to 2006, the OCC and the Fed examined these affiliated-party transactions and found that they complied with prevailing regulations and guidance, did not disclose any cost disadvantage to Commerce and in some cases resulted in cost advantages, were made at predominantly market rates, and were consistent with arms-length guidelines.

7.    In addition, Commerce itself has never asserted that the affiliated-party transactions in which Mr. Hill or Mrs. Hill were involved harmed Commerce.  In fact, the opposite is true—in its public filings Commerce has asserted that the affiliated-party transactions in which Mr. Hill or Mrs. Hill were involved were completed at prices comparable or more favorable than those services that could have been obtained or received from non-affiliated parties.  For example, at the urging of the OCC and the Fed, Commerce retained an independent third party—Smart and Associates LLP—to analyze the services provided by InterArch, the architectural and design firm wholly-owned by Shirley Hill.  In a report dated August 24, 2004, Smart and Associates determined that InterArch's "hourly rates are well below those of the competitors identified by Smart and equal to or lower than those that would be contracted in an arm's length transaction."  The report also stated that "[t]otal project fees paid to InterArch are significantly below industry averages" and that "if Commerce procured similar design services

5

from other vendors … the additional cost to Commerce in 2003 would have exceeded $3.3 million."

8.     After years of examining affiliated-party conduct without issuing any conclusions of misconduct, in late 2006, in a sudden turnabout, the OCC set upon a course to drive Mr. Hill out of Commerce based on unsubstantiated allegations that certain affiliated-party transactions that were previously examined by the OCC without action now were deemed against Commerce's interest.  OCC examiners have not interviewed—nor have they ever sought to interview—Mr. Hill.  Nor have they, or any other regulators, ever made or issued any finding that Mr. Hill acted improperly.

9.     Nevertheless, the OCC pressured Commerce to terminate its relationship with Mr. Hill.  In order to exert pressure on Commerce, the OCC refused to approve numerous pending branch applications unless and until Commerce terminated Mr. Hill.  The OCC also threatened to make public allegations of wrongdoing by Commerce if it did not summarily remove Mr. Hill from his executive positions with Commerce.

10.     The OCC exercised coercive power over Commerce such that the actions of Commerce's Directors pertaining to Mr. Hill, Mrs. Hill, and InterArch were for purposes of this action equivalent to the actions of federal officials acting under color of federal law.

11.     As a result of the OCC's actions, Commerce and the Commerce Directors improperly excluded Mr. Hill from important meetings, forced him to resign from the Bank, and terminated his employment contract.  Further, Commerce has refused to pay Mr. Hill monies

owed to him under his employment agreement, despite acknowledging in public filings that such payments are owed to Mr. Hill. Commerce representatives have stated that Commerce would make the payments due to Mr. Hill but for its fear that making such payments would antagonize its federal bank regulators.

12.    Defendants, upon information and belief acting at the behest of the OCC, have also taken actions directed at Mrs. Hill. Specifically, Commerce has refused to pay monies owed to Mrs. Hill and/or InterArch, despite its contractual obligations. Moreover, Commerce continued to accept services from InterArch after having determined that it would breach its contract with InterArch and would not pay monies owed to InterArch for services rendered.

13.    Specifically, beginning in or about August 2007, the OCC mandated that Commerce discontinue any further business with Mrs. Hill and InterArch and impose a unilateral 10 percent discount on each invoice billed by InterArch (the "10 percent holdback"), as a condition of the OCC's agreement to approve new Bank branch applications. Subsequently, Commerce and the Commerce Directors, without the consent of InterArch (i) instituted a 10 percent holdback; (ii) wrongfully terminated the contractual relationship with InterArch effective October 31, 2007 (two months prior to the contractual expiration date of December 31, 2007); and (iii) failed to pay any outstanding invoices. As a result of these decisions, Commerce has wrongfully and maliciously failed to pay approximately $2.9 million, exclusive of interest, to InterArch, without providing any justification for its failure to pay for InterArch's valuable services.

14.    Upon information and belief, Commerce has taken all of these actions against Mrs. Hill and InterArch at the behest of the OCC.

15.    Commerce has infringed InterArch's copyrights by unauthorized use of InterArch's architectural plans, which were used for the construction of Commerce branches, and other copyrighted documents.

16.    Commerce also conspired with Scott Hite ("Mr. Hite") to destroy InterArch's business by, *inter alia*, stealing InterArch's key employees.

17.    As a consequence of this wrongful conduct by Commerce and its Board of Directors, under the direction of the OCC, Mr. Hill, Mrs. Hill, and InterArch have been compelled to commence this action.

### THE PARTIES

18.    Plaintiff Vernon W. Hill, II, is a New Jersey resident, residing in the Township of Moorestown, Burlington County.  Until June and July 2007, respectively, Mr. Hill was the President and Chief Executive Officer of Commerce Bank and Commerce Bancorp.

19.    Plaintiff Shirley Hill is the wife of Plaintiff Vernon W. Hill, II and is also a New Jersey resident, residing in the Township of Moorestown, Burlington County, New Jersey. Mrs. Hill is the founder, President, and owner of InterArch.

20.    Plaintiff InterArch, Inc., is an architectural and design firm incorporated in New Jersey, having its principal place of business in the Township of Mount Laurel, Burlington County, New Jersey.

21.    Defendants Dennis M. DiFlorio, Jack R. Bershad, Joseph Buckelew, Donald T. DiFrancesco, Morton N. Kerr, John K. Lloyd, George E. Norcross, III, Daniel J. Ragone, William A. Schwartz, Jr., Joseph S. Vassalluzzo, and Robert D. Falese were members of the Board of Directors of the Holding Company and/or Officers of the Holding Company (collectively "Commerce's Directors"), and as such were charged with the direction and management of Commerce's affairs in accord with its charter and applicable laws. They are sued here in their capacities as Officers and Directors of Commerce.

22.    Defendant Scott Hite ("Mr. Hite") is a resident of the State of New Jersey.

23.    Defendant Commerce Bancorp, Inc., a bank holding company, is incorporated in New Jersey and conducts substantial business in the District of Columbia. It is the parent company of Commerce Bank, N.A.

24.    Defendant Commerce Bank, N.A., a Pennsylvania corporation, is a national banking association and conducts substantial business in the District of Columbia. The Bank is a wholly-owned subsidiary of Commerce Bancorp, Inc.

## JURISDICTION

25.    This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338.

26.    This Court has subject matter jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

27.    Upon information and belief, the Defendants have had substantial contacts with this District in connection with the allegations herein.

## VENUE

28.    This District is the appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### Mr. Hill Builds and Transforms Commerce Bancorp Into One of America's Leading Banks

29.    Mr. Hill founded Commerce in 1973 with the opening of a single branch in Marlton, New Jersey.  Between 1973 and 2007, Mr. Hill built Commerce into one of the largest and most successful banks in the mid-Atlantic region and the largest Bank based in New Jersey by growing its branches to more than 425 from just one, with virtually all of that growth being organic.  Under Mr. Hill's stewardship, Commerce revolutionized the banking industry by implementing Mr. Hill's ideas that included providing ultra-modern, distinctive and convenient branch locations, free checking, seven-day banking and extended and weekend hours, and free coin-counting machines.  While Mr. Hill pioneered these ideas, they are now also standard practice at many leading banking institutions around the country.

30.    Under the leadership of Mr. Hill, Commerce's first 34 years were marked by rapid but prudent growth, sound profitability, and excellent financial returns to its shareholders. The company's earnings per share have risen at an average annual rate of 23 percent for the past 20 years. Over that same period, the holding company's stock has generated a return roughly five times that of the S&P index. Its annual revenues have exponentially increased to $1.6 billion and it currently has a market capitalization of $7.6 billion, which ranks it third among 146 regional U.S. banks.

31.    Commerce has created rapid growth by aggressively building new branches in prime market areas. Currently, the Bank operates branches in the District of Columbia, Virginia, Maryland, Pennsylvania, New Jersey, New York, Connecticut, Delaware, and Florida. Commerce has assets of more than $48 billion and deposits of $44 billion.

32.    Mr. Hill served as the Chairman, President, and CEO of the Bank until June of 2007 and the Holding Company until July of 2007, when he was forced out of his positions at both institutions by the Holding Company's Board of Directors at the direction of the OCC.

33.    On October 2, 2007, after Mr. Hill was forced out of his positions at both institutions, TD Bank Financial Group ("TD") announced that it had reached a definitive agreement to acquire Commerce in a 75 percent stock and 25 percent cash transaction valued at $8.5 billion. Under the agreement, Commerce Bancorp shareholders will receive 0.4142 shares of TD common stock and $10.50 in cash in exchange for each common share of Commerce

Bancorp. This transaction is expected to close in February 2008 at which point Commerce Bancorp will become part of a Canadian company.

### Mr. Hill's Employment Agreement

34.    On January 1, 1992, Mr. Hill entered into an Employment Agreement with the Holding Company. This agreement, which was in effect until December 31, 2005, provided that Mr. Hill would be employed as the Chairman, President, and CEO of the Holding Company for a term of five years beginning on January 1, 1992, renewing automatically on each anniversary date for a new five-year term. The agreement was approved by the Commerce Bancorp Board of Directors and publicly disclosed.

35.    On March 14, 2006, Mr. Hill entered into an Amended and Restated Employment Agreement ("Employment Agreement") with the Holding Company. A copy of the Employment Agreement is attached hereto as Exhibit A. The OCC did not indicate any objection to the Employment Agreement. The Employment Agreement was approved by the Holding Company Board of Directors and publicly disclosed.

36.    The Employment Agreement provides that Mr. Hill is to be employed as the Chairman, President, and CEO of Commerce Bancorp for a term of five years beginning on January 1, 2006, renewing automatically on January 1, 2007, and ending on December 31, 2011.

37.    Pursuant to the Employment Agreement, Mr. Hill's base salary is to be at a rate of not less than $1,000,000 per year. Mr. Hill's base salary at the time of his termination was

$1,000,000 per year and his bonus paid in 2007 with respect to his services during 2006 was $1,500,000.

38.    The Employment Agreement also entitled Mr. Hill to participate in all fringe benefits including, without limitation, medical and hospitalization coverage, life insurance coverage, and disability coverage.

39.    The Employment Agreement allows for Commerce Bancorp to terminate Mr. Hill's employment "For Cause" or "Without Cause" as provided therein.

40.    Under section 7.1 of the Employment Agreement, Commerce Bancorp has the right to terminate Mr. Hill's employment "Without Cause" by giving him not less than thirty days' prior written notice of its intention to terminate his employment.

41.    Section 7.2 defines "Without Cause" as "any reason other than by either Termination 'For Cause' [], or Termination at Anniversary...."

42.    Upon termination Without Cause, pursuant to section 7.3 of the Employment Agreement, Commerce Bancorp is required to pay Mr. Hill the following:

(a)    ***Compensation through Termination Date.***  Any pro-rated portion of his full Compensation through the date of termination; and

(b)    ***"Without Cause Severance Payment"***.  A lump sum severance payment (the ***"Without Cause Severance Payment"***) in lieu of any further Compensation payments to Hill after the date of termination.

    (i)    ***"Without Cause Severance Payment"*** means the sum of Hill's full Compensation that would still be remaining until the end of the then Term had Hill continued to be employed by Commerce to the end of the then Term.

13

Section 3.1 of the employment agreement defines "Compensation" as "the sum of the highest annual rate of base salary ... and highest cash bonus ... paid to Hill during the most recent twenty-four (24) months of the Term."

43.     In addition, upon termination Without Cause, pursuant to section 11 of the Employment Agreement, the Holding Company is required to permit Mr. Hill to participate in the Holding Company's medical, disability, hospitalization, and life insurance benefits for three years.

44.     Further, any outstanding options held by Mr. Hill to purchase Commerce Bancorp stock shall vest as of the date of termination of Mr. Hill's employment.

45.     Under section 12.2 of the Employment Agreement, following termination Without Cause, all payments due and owing Mr. Hill are required to be paid within thirty days from the date of his termination of employment.

### The OCC Pressures Commerce to Terminate Mr. Hill

46.     On information and belief, in order to exert pressure on Commerce to take certain actions against Mr. Hill, the OCC threatened to release unsubstantiated "findings of fact," initiate an administrative action against Commerce, and refuse to approve branch applications, which Commerce was entitled to have approved.  Also, on information and belief, at one point the OCC refused to participate in any meeting with Commerce if Mr. Hill, its then-President and CEO, were present.

14

47.     A key component of the OCC's leverage over Commerce was its ability to delay branch applications until its investigation was concluded. This coercion was effective because Commerce's business model – which had been very successful – was rapid growth by building new branches. For example, by letter, on May 10, 2007, the OCC informed Messrs. Vassalluzzo, Lloyd, Bershad, and Hill that it would not be able to act with respect to any pending branch application or request for additional investment in Bank premises while certain issues remained unresolved.

48.     In late June, upon information and belief, in response to the OCC's pressure and threats, the OCC and Commerce and Commerce's Directors reached a "deal" or "agreement" whereby Mr. Hill's employment would be terminated. On June 28, 2007, Commerce and Commerce's Directors, upon information and belief, acting at the instruction of the OCC, and in response to pressure exerted by the OCC, ratified a resolution terminating Mr. Hill's employment Without Cause, effective July 31, 2007.

49.     On that same day, June 28, 2007, Commerce's Board executed a Consent Order with the OCC and a Memorandum of Understanding with the Fed.

50.     The Consent Order specifically requires Commerce to create a plan detailing steps the Board will take to address "necessary or desirable changes" to Commerce's management structure.

51.     Acting under direct or indirect instructions from the OCC, Commerce excluded Mr. Hill from Board meetings at which his employment status would be discussed, and

15

from meetings with the OCC. As a result, Mr. Hill does not have full and complete access to information regarding all of the specific statements and actions taken by Commerce's Board. Upon information and belief, several meetings and other contacts with the OCC in connection with this matter occurred in this District.

52.    In effect, the OCC presented Commerce's Board with two options: (i) remove Mr. Hill or (ii) be deprived of the opportunity to open new branches and become subject to ongoing regulatory action that would cripple Commerce's ability to continue to grow.

53.    An article in the July 1, 2007, Philadelphia Inquirer cites "three Commerce sources with direct knowledge" as saying that:

> [F]ederal regulators presented bank executives and board members with two options: Remove ... Vernon W. Hill II or face increased scrutiny, the kind that executives feared would cripple the bank's growth.

John Shiffman, *Regulator's 'Ultimatum' Forced Action*, Philadelphia Inquirer, July 1, 2007, at A16.

54.    The OCC exercised coercive power over Commerce such that the actions of Commerce's Directors pertaining to Mr. Hill were for purposes of this action equivalent to the actions of federal officials acting under color of federal law.

55.    Upon information and belief, Commerce's Directors would not have terminated Mr. Hill's employment if not directed to do so by the OCC.

56.    As a direct result of the OCC's actions and the unsubstantiated allegations against Mr. and Mrs. Hill it has made, Commerce has become the subject of numerous class action lawsuits.  Later, after Mr. Hill's departure resulted in the forced sale of Commerce to a foreign bank, additional class action lawsuits were brought challenging the sale.  In addition, in its public filings, Commerce has stated that Commerce Chairman Dennis DiFlorio would earn a total of $7.6 million, CEO Robert Falese would earn $7.3 million, chief financial officer Douglas Pauls would earn $4 million and insurance division chairman George Norcross III would earn $7.6 million, if they remain with TD Bank after the acquisition.  The only Commerce executive not benefiting from the TD Bank acquisition is Commerce's founder and leader for 34 years, Mr. Hill, who was driven out of Commerce based on unsubstantiated allegations prior to the proposed acquisition.

**Commerce Bancorp Breaches the Terms of the Employment Agreement with Mr. Hill**

57.    By its letter of July 3, 2007, Commerce Bancorp acknowledged that under the Employment Agreement the following contractual obligations were triggered by Mr. Hill's termination Without Cause:

(a)    "Separation Payment in the amount of $11,250,000.00 that would have been paid to Mr. Hill had he continued to be employed by Commerce Bancorp, Inc. until December 31, 2011."

(b)    "Participation in all Commerce Bancorp, Inc. medical, disability, hospitalization and life insurance benefits for a period of three (3) years from the date of the termination of Mr. Hill's employment."

(c)    "Immediate vesting of any outstanding options to purchase Commerce Bancorp, Inc.'s stock as of the date of termination of employment."

(d)    "Release from any restrictive covenants on the termination date."

17

58.     On July 13, 2007, Mr. Hill served Commerce Bancorp with a written demand that it comply with the Employment Agreement by providing him with (i) his Without Cause severance payment in the amount of $11,250,000 under section 7.3(b) of the Employment Agreement, plus annual bonus, estimated at approximately $750,000; (ii) three years' participation in Commerce's medical, disability, hospitalization, and life insurance benefits under section 11.1(a) of the Employment Agreement; (iii) vesting of his outstanding options under section 11.1(b) of the Employment Agreement; and (iv) Commerce Bancorp stock allocated to his accounts under the Commerce 401(k)/ESOP.

59.     Despite this written demand, and the fact that all payments due and owing Mr. Hill were required to be paid by August 31, 2007, Commerce Bancorp has failed to provide Mr. Hill with all the payments and benefits due and owing him under the terms of the Employment Agreement.

60.     According to section 14 of the Employment Agreement, Mr. Hill is entitled to full reimbursement from Commerce Bancorp for all costs and expenses, including reasonable attorneys' fees, costs, and interest, incurred in enforcing his rights under the Employment Agreement ("Enforcement Expenses") based upon Commerce Bancorp's failure to pay and provide Mr. Hill with the benefits due under the Employment Agreement.

61.     The Employment Agreement also provided Mr. Hill the right to participate in the Commerce stock-option plan.  On October 11, 2007, Mr. Hill attempted to exercise 500,000 stock options expiring in 2016 and 200,000 options expiring in 2017.  At the current

market price on that date, the pre-tax proceeds from the exercise of those options would have been approximately $3.5 million. Commerce Bancorp has not yet executed Mr. Hill's exercise of those options.

62.  Under section 14.3 of the Employment Agreement, Mr. Hill is entitled to such payment and reimbursement for Enforcement Expenses provided that: (i) Commerce Bancorp does not cure its failure to pay or provide Mr. Hill any amounts or benefits owed him within 30 days after receiving Mr. Hill's written notice of such failure; and (ii) Mr. Hill's action in enforcing his rights is not frivolous (hereinafter "Enforcement Provisions").

63.  On September 10, 2007, Mr. Hill provided written notice to the Holding Company detailing its failure to provide him with the payments and benefits under the Employment Agreement.

64.  Commerce Bancorp has failed to cure its refusal to provide Mr. Hill with the payments and benefits due and owing him under the Employment Agreement. Accordingly, the Holding Company is obligated to pay Mr. Hill's Enforcement Expenses, including but not limited to fees and costs for prosecuting this action.

**Mr. Hill's Inability to Obtain Employment As a Result of Commerce's Actions**

65.  By publicly forcing Mr. Hill out of Commerce under an unfounded cloud of suspicion, Commerce and Commerce's Directors have severely damaged Mr. Hill's reputation in the banking industry and his ability to secure new employment with another bank or bank holding company.

### Mrs. Hill Builds InterArch Into a Leading Design Firm

66.    Mrs. Hill is a graduate of the Pratt Institute of New York.  In 1973, Mrs. Hill founded InterArch, an architecture and design firm that has undertaken various commercial design projects in locations from Boston to Florida.  Since its founding, Mrs. Hill has at all times served as President of InterArch.  InterArch employed over 60 employees who had experience in architecture and design, landscape architecture, and industrial, product, furniture, lighting, and graphic design.

67.    For 35 years, InterArch has been engaged to provide interior design, exterior design, administration and management, construction procurement, bidding and negotiation, contract negotiation, space planning, move coordination, fixtures, furniture, and artwork procurement, project administration, and landscape design services to Commerce. InterArch has been instrumental in creating the unique and distinctive design, look, and feel of Commerce's branches.  InterArch has designed Commerce branches from Boston to Florida.

68.    Over the past 35 years, InterArch has foregone numerous other contracts and projects and devoted almost all of its time, effort, and energy to serving Commerce's needs.

69.    During 2007, InterArch designed Commerce branch locations in, among other locations, New Canaan, Connecticut, Shelton, Connecticut, Carl Springs, Florida, Derwood, Florida, Juno Isles, Florida, Riviera Beach, Florida, Essex, Maryland, Germantown, Maryland, East Rutherford, New Jersey, Jamesburg, New Jersey, Morristown, New Jersey, New York, New York, Lower Moreland, Pennsylvania, Philadelphia, Pennsylvania, Richboro, Pennsylvania,

Arlington, Virginia, and Leesburg, Virginia. InterArch also designed and collaborated in the creation of operational facilities for Commerce in, among other locations, Calverton, Maryland and Cyprus Creek, Florida.

### InterArch's and Commerce's Contractual Agreements

70.     In recent years, it was Commerce and InterArch's practice for InterArch to submit a proposal of services ("Proposal of Services") to Commerce for the upcoming year. The Proposal of Services included both a list of services that InterArch intended to perform for Commerce and a rate schedule for that work.

71.     In recent years, it was Commerce's practice to accept the Proposal of Services and to notify InterArch that it had accepted the Proposal of Services.

72.     In each instance, Commerce's Board of Directors approved InterArch's Proposal of Services, and its approval was disclosed to the Fed, the OCC, and Commerce's shareholders.

73.     In recent years, Commerce and InterArch agreed that InterArch was to be Commerce's sole provider of interior design, exterior design, space planning, move coordination, and landscape design services.

74.     Pursuant to its agreements with InterArch, Commerce compensated InterArch for the work it performed on Commerce's behalf based on a flat fee or based on the number of hours InterArch spent on a particular project.

21

**The Master Agreement Between InterArch and Commerce**

75.    Consistent with Commerce's and InterArch's practice, on December 5, 2005, InterArch submitted a Proposal of Services to Commerce for the 2006 calendar year.

76.    Commerce accepted InterArch's 2006 Proposal of Services.  That proposal included an agreement by Mrs. Hill to provide her professional services free of charge.  This saved Commerce approximately $300,000 in 2006.

77.    Upon information and belief, this acceptance was approved by Commerce's Board of Directors.

78.    On February 27, 2006, InterArch and Commerce executed a Master Agreement for Architectural/Engineering/Consultant Services ("Master Agreement").  The term of the agreement is January 1, 2006, until December 31, 2006.  A copy of the Master Agreement is attached hereto as Exhibit B.

79.    Upon information and belief, the Master Agreement was approved by Commerce's Board of Directors.

80.    Throughout 2006, Commerce and InterArch acted consistent with the Master Agreement.

**The 2007 Agreement Between InterArch and Commerce**

81.    Consistent with Commerce's and InterArch's pattern and practice, on December 13, 2006, InterArch submitted its 2007 Proposal of Services to Commerce.  That

proposal included a list of services that InterArch offered to perform for Commerce during the upcoming year and a rate schedule for that work. Like the 2006 Proposal of Services, the 2007 Proposal of Services provided that Mrs. Hill would provide her professional services free of charge.

82.     Commerce's Board of Directors accepted and approved InterArch's 2007 Proposal of Services on or about February 20, 2007.

83.     Commerce notified InterArch that it had accepted InterArch's 2007 Proposal of Services.

84.     Commerce also delivered a copy of InterArch's 2007 Proposal of Services to InterArch with a handwritten note indicating that Commerce's Board of Directors had accepted InterArch's 2007 Proposal of Services.

85.     Upon information and belief, Commerce accepted InterArch's 2007 Proposal of Services upon the same terms and conditions as the Master Agreement; therefore, all of the terms and conditions of the Master Agreement remained in effect through December 31, 2007. Consistent with prior contractual dealings, InterArch provided Commerce with a 5 percent fees reduction, which reduction Commerce accepted.

86.     Pursuant to Commerce's agreements with InterArch, including, but not limited to the Master Agreement, Commerce was prohibited from terminating its contractual relationship with InterArch before December 31, 2007, unless: (i) InterArch has failed to materially perform in accordance with the terms of the Master Agreement; (ii) Commerce has

notified InterArch of such a breach; and (iii) Commerce has provided InterArch with sixty days to cure the breach.

87.    Accordingly, Commerce is legally obligated to adhere to Commerce's agreements with InterArch, including, but not limited to the Master Agreement, through December 31, 2007.

88.    To meet Commerce's requests, InterArch declined to seek and to accept other business for the 2007 calendar year.

89.    Pursuant to Commerce's agreements with InterArch, including, but not limited to the Master Agreement, Commerce is obliged to pay each invoice in full within thirty days of receiving it.  To date, Commerce owes InterArch approximately $2.9 million, exclusive of interest.  This amount includes the full amount Commerce owes on unpaid InterArch invoices from prior to June 2007 through October 2007 as well as amounts that Commerce has failed to pay on other invoices as a unilateral 10 percent holdback on invoices which it has otherwise paid in part.  InterArch did not consent to this holdback.

90.    Article 13 of the Master Agreement provides Mrs. Hill and InterArch the right to indemnification from Commerce.  It incorporates by reference Paragraph 5 of the January 15, 2002 Agency Agreement ("Agency Agreement") between InterArch and Commerce, which is attached hereto as Exhibit C, and provides in relevant part that, "Commerce shall fully indemnify InterArch against, and defend and hold it, its officers, directors, employees, agents and other representatives harmless from any and all liability and related expenses (including

24

without limitation reasonable fees and expenses of its counsel) incurred by InterArch and its officers, directors, employees, agents and other representatives, which may arise out of acts performed or omitted in connection with Projects and this Agreement."

91.     Pursuant to the Master Agreement and the Agency Agreement, Commerce is obligated to indemnify Mrs. Hill and InterArch for the costs that they have incurred as a result of investigations of Commerce by the OCC and other federal agencies. In addition, Commerce is obligated to reimburse InterArch for any legal fees it expends to enforce its agreements with Commerce.

**The OCC Pressures Commerce to Terminate its Relationship with InterArch**

92.     Upon information and belief, the OCC directed that Commerce unilaterally institute a 10 percent holdback of fees owed to InterArch, terminate its agreements with InterArch on October 31, 2007 (prior to the contractual deadline), and stop paying invoices due to InterArch after June 2007. In addition, given Commerce's sole reliance on InterArch to design and build the branches, the OCC knew or had reason to know that requiring Commerce to take these actions would leave Commerce with no choice but to pirate InterArch's employees, or face substantial delays in building and designing the branches, which would have a detrimental effect on Commerce's profitability.

93.     The OCC has no statutory authority or other legal authority to require Commerce to amend, modify, or terminate its agreements with InterArch, or stop paying invoices.

94.     The OCC exercised coercive power over Commerce such that the actions of Commerce's Directors were, for purposes of this action, equivalent to the actions of federal officials acting under color of federal law.

95.     Upon information and belief, Commerce's Directors would not have failed to pay the InterArch invoices due and owing, as described above, instituted the 10 percent holdback, or terminated Commerce's agreements with InterArch, including, but not limited to the Master Agreement, before the contract expiration date if not directed to do so by the OCC.

**Commerce Terminates Its Agreements with InterArch**

96.     Despite InterArch providing valuable services to Commerce and without any warning or proper notice and in violation of its agreements with InterArch, Commerce unilaterally and without justification terminated its agreements with InterArch, including, but not limited to the Master Agreement, effective October 31, 2007, even though the Agreement by its terms ran through December 31, 2007.

97.     Upon information and belief, Commerce continued to accept the services of InterArch even after it had decided – without informing InterArch – that it would unilaterally terminate InterArch's services prior to the end of the contractual term and that it would not pay for InterArch's services that were provided to Commerce (or it that it would withhold 10 percent of each invoice for such services).

98.     Since at least June 2007, without the consent of InterArch and in violation of its agreements with InterArch, Commerce arbitrarily and capriciously instituted a 10 percent holdback on invoices submitted by InterArch.

99.    Despite written demands to Commerce that it comply with its agreements with InterArch, including, but not limited to the Master Agreement, Commerce has refused to do so.

### Commerce Contemplates Acquiring InterArch and Requests Permission to Hire InterArch's Employees

100.    In February 2007, the Commerce Governance Committee recommended that Commerce acquire InterArch and hire all InterArch employees—including Mrs. Hill—but the full Board of Directors never voted on the proposal.  Upon information and belief, this is because the OCC objected to the acquisition of InterArch.

101.    In July 2007, Dennis DiFlorio, the Chairman of Commerce, met with Mrs. Hill and asked her to permit Commerce to hire InterArch's employees.  Mrs. Hill informed Commerce that she would not permit Commerce to hire InterArch's employees.

102.    In August 2007, Fred Graziano, President of Commerce's Retail Banking division, met with Mrs. Hill and asked her to permit Commerce to hire InterArch's employees.  Again, Mrs. Hill informed Commerce that she will not permit Commerce to hire InterArch's employees.

### Commerce and Mr. Hite Steal InterArch's Employees

103.    Upon information and belief, in or about July 2007, Commerce contacted Mr. Hite with the malicious intent to induce Mr. Hite to resign from InterArch and take a job with Commerce, which Mr. Hite agreed to do.

104.    Upon information and belief, in or about July 2007, Commerce and Mr. Hite maliciously and intentionally conspired to induce other key employees of InterArch to resign from InterArch and take a job with Commerce.

105.    Upon information and belief, Mr. Hite and Commerce entered into this conspiracy with the malicious intent to destroy InterArch's business and steal InterArch's business.

106.    In furtherance of this conspiracy, prior to October 31, 2007, Mr. Hite contacted certain InterArch employees with the malicious intent to induce them to resign from InterArch and take a job with Commerce.

107.    Upon information and belief, in furtherance of this conspiracy, Commerce contacted certain InterArch employees with the malicious intent to induce them to resign from InterArch and take a job with Commerce.

108.    Beginning prior to October 31, 2007, Commerce and Mr. Hite maliciously and intentionally concealed this conspiracy from InterArch and Mrs. Hill.

109.    Without prior notice, on November 1, 2007, Mr. Hite and other InterArch employees resigned from their positions at InterArch effective immediately.

110.    Upon information and belief, some or all of the employees who resigned from their positions at InterArch on November 1, 2007, were among the employees contacted by Mr. Hite and Commerce.

111.    Upon information and belief, the employees who resigned from their positions at InterArch on November 1, 2007, would not have resigned from their positions at InterArch absent Commerce's and Mr. Hite's actions.

112.    The employees who resigned from their positions at InterArch on November 1, 2007, have accepted positions with Commerce.

113.    The employees who resigned are critical to InterArch's business. Commerce and Mr. Hite believed that luring these employees away from InterArch would have the effect of destroying InterArch.

### Commerce Infringes InterArch's Copyrights

114.    InterArch owns valid copyrights in architectural designs, plans, drawings, and specifications, prepared by InterArch ("InterArch's IP") relating to the construction of Commerce buildings.

115.    InterArch's IP is incorporated both in technical designs and in "architectural works" as that term is defined within the copyright laws of the United States.

116.    InterArch's IP was created at substantial expense and effort.

117.    In December 2007, InterArch applied for copyright registrations with the United States Copyright Office for certain of InterArch's IP.  InterArch also claims valid copyrights in other aspects of InterArch's IP that are expected to be the subject of additional forthcoming applications to the United States Copyright Office.

118.    InterArch's IP was not created by anyone who was, at the time of creation, an employee of any of the Defendants, and InterArch's IP was not created within the scope of any employment by any of the Defendants.

119.    The Master Agreement does not provide that Commerce owns any copyrights in InterArch's IP that was produced pursuant to the Master Agreement.  To the contrary, the Master Agreement explicitly provides that InterArch's designs, plans, drawings, and specifications "may not be used by [Commerce] for any other project unless [Commerce] provides prior notice to [InterArch] and agrees to pay a reasonable fee for such use."

120.    InterArch's IP is not work made for hire.

121.    None of InterArch's IP is a contribution to a collective work, part of a motion picture or other audiovisual work, a translation, supplementary work, a compilation, an instructional text, a test, answer material for a test, or an atlas.

122.    At no time did InterArch or Mrs. Hill ever give Commerce or any of the other Defendants permission, express, or implied, to utilize any aspect of InterArch's IP after Commerce terminated its agreements with InterArch, except as expressly set forth in the Master Services Agreement.

123.    Upon information and belief, despite refusing to pay monies due to InterArch, Commerce has copied and continues to use and/or exploit InterArch's IP in the construction of one or more of Commerce's buildings.

124.    Upon information and belief, Commerce or other architectural firms working under the direction of Commerce have made other uses of InterArch's IP that are as yet unknown to Plaintiffs in order to complete buildings that were unfinished at the time of InterArch's termination and/or on other building designs that are derivative of and/or employ original features of InterArch's IP, including but not limited to the works that are the subject of InterArch's copyright registration applications.

125.    Commerce's copying and employment of InterArch's IP without InterArch's express consent violates InterArch's exclusive rights to reproduce its copyrighted works and to prepare derivative works.

### FIRST CLAIM FOR RELIEF
**(Violation of the Fifth Amendment Right to Due Process Pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*)**
**(Mr. Hill Against Commerce's Directors)**

126.    Plaintiff Mr. Hill repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

127.    Mr. Hill has a cause of action against Commerce's Directors in their individual capacity for damages arising out of their violation of the United States Constitution while acting under color of federal law or authority.

128.    Commerce's Directors terminated Mr. Hill's employment Without Cause at the specific direction of, and acting in concert with, the OCC, thus depriving Mr. Hill of his constitutionally-protected property right to continued employment at Commerce.  This action

was taken by Commerce's Directors while acting pursuant to their duties and under color of federal law or authority.

129.    Commerce's Directors terminated Mr. Hill's employment Without Cause at the specific direction of, and acting in concert with, the OCC, thus depriving Mr. Hill of his procedural rights guaranteed by federal law—including written notice, a hearing, the right to appeal, the right to present evidence, and the right to cross-examine witnesses—to which he would have been entitled had the OCC gone through the appropriate channel for suspension/removal of a bank officer pursuant to 12 U.S.C. § 1818(e).  This action was taken by Commerce's Directors while acting pursuant to their duties and under color of federal law or authority.

130.    The actions of Commerce's Directors violated Mr. Hill's Fifth Amendment Right of Due Process as guaranteed by the United States Constitution.  Pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), Commerce's Directors are personally and individually liable for all of Mr. Hill's damages which proximately resulted from their knowing and intentional actions.  These damages include, but are not limited to, loss of property, pain and suffering, and loss of reputation and goodwill.

**SECOND CLAIM FOR RELIEF**
**(Violation of the Fifth Amendment Right to Due Process Pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*)**
**(InterArch and Mrs. Hill Against Commerce's Directors)**

131.    Plaintiffs InterArch and Mrs. Hill repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

132.    InterArch and Mrs. Hill have a cause of action against Commerce's Directors in their individual capacity for damages arising out of their violation of the United States Constitution under color of federal law or authority.

133.    Commerce's Directors instituted a 10 percent holdback, terminated the Master Agreement, and stopped paying InterArch's invoices, at the specific direction of, and acting in concert with, the OCC, thus depriving InterArch and Mrs. Hill of their constitutionally-protected property rights.  This action was taken by Commerce's Directors while acting pursuant to their duties under color of federal law or authority.

134.    The actions of Commerce's Directors violated InterArch's and Mrs. Hill's Fifth Amendment Right of Due Process as guaranteed by the United States Constitution. Pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), Commerce's Directors are personally and individually liable for all of InterArch's and Mrs. Hill's damages which proximately resulted from Commerce's Directors knowing and intentional actions.  These damages include, but are not limited to, loss of property, pain and suffering, and loss of reputation and goodwill.

### THIRD CLAIM FOR RELIEF
### (COPYRIGHT INFRINGEMENT)
### (InterArch Against Commerce Bancorp and CB)

135.    Plaintiff InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

136.    InterArch owns valid copyrights in InterArch's IP that it prepared in connection with its work for Commerce.

33

137.    InterArch has filed registration applications with the United States Copyright Office seeking to register certain of its copyrights for InterArch's IP.

138.    Commerce's conduct, including copying InterArch's IP and employing InterArch's IP in new and ongoing projects without InterArch's express consent, violates InterArch's exclusive rights in its copyrights.

139.    Commerce's conduct constitutes copyright infringement under the federal Copyright Act, 17 U.S.C. §§ 101 *et seq*.

140.    Commerce's infringement has damaged InterArch in an amount to be determined at trial.  For example and without limitation, Commerce has been unjustly enriched through their unlawful use of InterArch's IP.

141.    Commerce's infringement has caused and, unless restrained by this Court, will continue to cause InterArch irreparable injury.

142.    InterArch has no adequate remedy at law for Commerce's infringement.

143.    Commerce should be permanently enjoined and restrained from copying, preparing derivative works based upon, or otherwise infringing, directly or indirectly, InterArch's IP.

144.    InterArch is entitled to recover all damages suffered as a result of Commerce's wrongful acts, including but not limited to the amount of Commerce's unjust enrichment.  In the alternative, InterArch is entitled to statutory damages in an amount to be

determined by the Court for its infringement of InterArch's IP that is subject to InterArch's

pending and anticipated copyright registration applications. InterArch is also entitled to recover

all reasonable attorneys' fees, court costs, and interest on its damages from the date of

Defendants' infringement.

### FOURTH CLAIM FOR RELIEF
### (Breach of Contract)
### (Mr. Hill Against Commerce Bancorp)

145.    Plaintiff Mr. Hill repeats and realleges each and every allegation in the

foregoing paragraphs as if fully set forth herein.

146.    Mr. Hill has done all things that have been required to be done by him

under the Employment Agreement and he is not in breach of that agreement.

147.    The Holding Company terminated Mr. Hill's employment Without Cause

effective July 31, 2007.

148.    Upon Mr. Hill's termination Without Cause, section 7.3(b) of the

Employment Agreement required Commerce Bancorp to pay Mr. Hill $11,250,000 representing

the compensation due and owing to him for the remaining term of the Employment Agreement,

and a pro-rata portion of his annual bonus.

149.    Upon Mr. Hill's termination Without Cause, section 11 of the Employment

Agreement required that Commerce Bancorp: (i) allow Mr. Hill to participate in Commerce

Bancorp's medical, disability, hospitalization, and life insurance benefits for three years; and (ii)

immediately vest all outstanding shares held by Mr. Hill to purchase Commerce Bancorp stock.

150.    The Holding Company has willfully and wrongfully breached the terms and conditions of the Employment Agreement by failing:

(a)    to pay Mr. Hill the compensation due and owing him for the remaining term of the Employment Agreement;

(b)    to allow Mr. Hill to participate in Commerce's medical, disability, hospitalization, and life insurance benefits for three years following his termination; and

(c)    to vest all outstanding shares held by Mr. Hill to purchase Commerce Bancorp stock.

151.    As a direct and proximate result of Commerce Bancorp's breach of the Employment Agreement, Mr. Hill has been damaged and his damages include lost compensation, lost medical coverage, and lost vesting rights to purchase Commerce Bancorp stock.

152.    The Enforcement Provisions of the Employment Agreement provide that Mr. Hill is entitled to full reimbursement from the Holding Company for all costs and expenses, including reasonable attorneys' fees, costs, and interest, incurred in enforcing his rights under the Employment Agreement based on the Holding Company's failure to provide Mr. Hill with the payments and benefits due and owing him under the Employment Agreement.

153.    Mr. Hill has fully complied with the Enforcement Provisions.  Despite doing so, Commerce Bancorp has willfully and wrongfully breached the Employment Agreement by failing to cure its refusal to provide Mr. Hill the payments and benefits due and owing him under the Employment Agreement.

154.    As a result of the Holding Company's conduct, Mr. Hill has incurred and will incur substantial attorneys' fees and costs, which he is entitled to full reimbursement for under section 14 of the Employment Agreement.

## FIFTH CLAIM FOR RELIEF
### (Breach of Contract)
### (InterArch Against Commerce Bancorp and CB)

155.    Plaintiff InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

156.    InterArch has done all things that have been required to be done by its agreements with Commerce, including, but not limited to the Master Agreement, and it is not in breach of those agreements.

157.    Commerce has terminated its agreements with InterArch, including, but not limited to the Master Agreement, effective October 31, 2007.

158.    Commerce has willfully and wrongfully breached the terms and conditions of its agreements with InterArch, including, but not limited to the Master Agreement, by failing to pay and honor the obligations imposed by those agreements.

159.    As a direct and proximate result of Commerce's breach of its agreements with InterArch, including, but not limited to the Master Agreement, InterArch has been damaged. Commerce has failed to pay InterArch approximately $2.9 million, exclusive of interest. This sum includes the amount that Commerce failed to pay as a result of the 10 percent holdback on invoices which have been paid in part. InterArch did not consent to this holdback.

37

160.    In addition, in reliance upon a course of conduct by Commerce over three decades, InterArch built up a work-force and infrastructure designed to serve Commerce's ongoing needs and declined to seek other opportunities.

161.    Indeed, had Commerce not led InterArch to believe that InterArch would be asked to continue to provide services throughout, at a minimum, 2008, InterArch would have pursued other opportunities.

162.    In addition, InterArch retains certain property interests in and contractual rights to the architectural plans it designed for Commerce.  Commerce has failed to pay InterArch for its rights in these plans despite being requested to do so.

### SIXTH CLAIM FOR RELIEF
### (Quantum Meruit \ Unjust Enrichment)
### (InterArch Against Commerce Bancorp and CB)

163.    In the alternative, if there were no contractual agreements between Commerce and InterArch for 2007, InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

164.    InterArch has provided interior design, exterior design, administration and management, construction procurement, bidding and negotiation, contract negotiation, space planning, move coordination, fixtures, furniture, and artwork procurement, project administration, and landscape design services for Commerce since December 31, 2006.

165.    InterArch performed such services in a good faith belief that it would be compensated for such services.

166.    Commerce has accepted such services.

167.    InterArch is entitled to the reasonable value of such services.

168.    If InterArch is not compensated for its services, Commerce will be unjustly enriched.

## SEVENTH CLAIM FOR RELIEF
### (Promissory Estoppel)
### (InterArch Against Commerce Bancorp and CB)

169.    In the alternative, if there were no contractual agreements between Commerce and InterArch for 2007, InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

170.    Commerce made a clear and definite promise that it would compensate InterArch for the services that it performed at Commerce's request.

171.    Commerce also made a clear and definite promise that InterArch would be its sole provider of various interior design, exterior design, administration and management, construction procurement, bidding and negotiation, contract negotiation, space planning, move coordination, fixtures, furniture, and artwork procurement, project administration, and landscape design services for the calendar year 2007, up to and including December 31, 2007.

172.    Commerce made those promises with the expectation and intention that InterArch would rely on those promises.

173.    InterArch relied upon Commerce's promises when it performed various interior design, exterior design, administration and management, construction procurement, bidding and negotiation, contract negotiation, space planning, move coordination, fixtures, furniture, and artwork procurement, project administration, and landscape design services at Commerce's request.

174.    InterArch also relied on those promises when it declined to seek other work.

175.    If InterArch is not compensated for the work it performed and the work it declined to seek at Commerce's behest, it will incur a substantial financial loss.

**EIGHTH CLAIM FOR RELIEF**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Mr. Hill Against Commerce Bancorp)**

176.    Plaintiff Mr. Hill repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

177.    The Holding Company is obligated under an implied covenant of good faith and fair dealing to act in good faith and deal fairly with respect to the Employment Agreement and the obligations it assumed thereunder.

178.    Commerce Bancorp breached its obligation of good faith and fair dealing through its termination of Mr. Hill's employment with Commerce Bancorp and its willful and wrongful failure to pay Mr. Hill the compensation and benefits due and owing him under the

Employment Agreement. Commerce Bancorp acted in a manner that damaged Mr. Hill's reputation in the banking industry and unfairly called into question Mr. Hill's business ethics.

179.    The breach by Commerce Bancorp of its obligations of good faith and fair dealing caused Mr. Hill damages in addition to those caused by Commerce Bancorp's breach of the Employment Agreement. Specifically, Commerce Bancorp's breach of its obligation of good faith and fair dealing has caused and will continue to cause Mr. Hill damages in the form of harm to his reputation, which has limited Mr. Hill's ability to secure new employment with a bank or bank holding company.

180.    As a result of the Holding Company's bad faith breach, Mr. Hill has incurred and will incur substantial attorneys' fees and costs.

### NINTH CLAIM FOR RELIEF
### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (InterArch Against Commerce Bancorp and CB)

181.    Plaintiff InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

182.    Commerce is obligated under an implied covenant of good faith and fair dealing to act in good faith and deal fairly with respect to its agreements with InterArch, including, but not limited to the Master Agreement and the obligations it assumed thereunder.

183.    Commerce breached its obligation of good faith and fair dealing through their termination of their agreements with InterArch, including, but not limited to the Master Agreement, its willful and wrongful imposition of a 10 percent holdback, and their failure to pay

InterArch the compensation and benefits due and owing it under its agreements with Commerce, including, but not limited to the Master Agreement. Commerce acted in a manner that damaged InterArch's reputation in the design industry and unfairly called into question InterArch's business ethics.

184.    The breach by Commerce of its obligations of good faith and fair dealing caused InterArch damages in addition to those caused to InterArch by Commerce's breach of its agreements with InterArch, including, but not limited to the Master Agreement. Specifically, Commerce's breach of its obligation of good faith and fair dealing has caused and will continue to cause InterArch damages in the form of harm to its reputation.

185.    As a result of Commerce's bad faith breach, InterArch has incurred and will incur substantial attorneys' fees and costs.

### TENTH CLAIM FOR RELIEF
### (Tortious Interference)
### (InterArch Against Commerce Bancorp and Mr. Hite)

186.    Plaintiff InterArch repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

187.    InterArch had a reasonable expectation of economic advantage stemming from its employment of its employees who were pirated by Commerce Bancorp and Mr. Hite.

188.    Commerce Bancorp and Mr. Hite intentionally and wrongfully interfered with InterArch's economic advantage by maliciously and unjustifiably inducing these employees to resign, en masse, from their positions at InterArch.

42

189.    Absent Commerce Bancorp's and Mr. Hite's intentional and wrongful conduct, InterArch possessed a reasonable likelihood of economic benefit from its employment of the pirated employees.

190.    As a result of Commerce Bancorp's and Mr. Hite's tortious interference, InterArch has incurred and will continue to incur damages in the form of lost revenue, the monetary value of the training of the pirated employees, the cost of recruiting and training new employees to replace the pirated individuals, and attorney's fees.

## ELEVENTH CLAIM FOR RELIEF
### (Contractual Indemnification)
### (Mr. Hill Against Commerce Bancorp)

191.    Plaintiff Mr. Hill repeats and realleges each and every allegation in the foregoing paragraphs as if fully set forth herein.

192.    Section 4.4 of the Employment Agreement provides that Mr. Hill is entitled to "[i]ndemnification by Commerce to the fullest extent permitted by governing law and in accord with Commerce's bylaws and policies, against all claims concerning Hill's status as an officer, director, employee, or agent of Commerce."

193.    Mr. Hill has incurred various costs and expenses for which the Holding Company is obligated to provide indemnification including those relating to shareholder actions and investigations by the OCC and other federal agencies, along with the instant employment dispute.

194.    Despite Mr. Hill's numerous requests for indemnification and the advance payment of defense costs, the Holding Company has steadfastly refused to indemnify and advance defense costs to Mr. Hill.

195.    Commerce Bancorp has willfully and wrongfully breached the Employment Agreement by refusing to indemnify and advance defense costs to Mr. Hill.

196.    As a result of Commerce Bancorp's breach, Mr. Hill has incurred and will incur substantial attorneys' fees and costs.

### TWELFTH CLAIM FOR RELIEF
### (Contractual Indemnification)
### (InterArch and Mrs. Hill Against Commerce Bancorp and CB)

197.    Plaintiffs InterArch and Mrs. Hill repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

198.    Pursuant to the Master Agreement and Agency Agreement, Commerce shall indemnify InterArch and Mrs. Hill for the costs that they have incurred as a result of the investigation of Commerce by the OCC and other federal agencies.

199.    Commerce shall also reimburse InterArch for any legal fees it expends to enforce its agreements with Commerce.

200.    InterArch and Mrs. Hill have incurred various costs and expenses for which Commerce is obligated to provide indemnification including those relating to investigations by the OCC and other federal agencies, along with the instant contractual dispute.

44

201.    Despite Mrs. Hill's and InterArch's numerous requests for indemnification and the advance payment of defense costs, Commerce has steadfastly refused to indemnify and advance defense costs to Mrs. Hill and InterArch.

202.    Commerce has willfully and wrongfully breached its agreements with InterArch, including, but not limited to the Master Agreement, by refusing to indemnify and advance defense costs to InterArch and Mrs. Hill.

203.    As a result of Commerce's breach, InterArch and Mrs. Hill have incurred and will incur substantial attorneys' fees and costs.

### THIRTEENTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)
### (Mr. and Mrs. Hill Against All Defendants)

204.    Plaintiffs Mr. and Mrs. Hill repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

205.    The conduct, actions, and statements of Defendants, as alleged herein, were intentional, reckless, outrageous, and done with the intent to cause Mr. and Mrs. Hill to suffer severe emotional distress.

206.    The conduct, actions, and statements of Defendants were done in willful and wanton disregard for the rights of Mr. and Mrs. Hill.

207.    Defendants' conduct, actions, and statements directly and proximately caused Plaintiffs Mr. and Mrs. Hill severe emotional distress.

## DEMAND FOR JURY

Plaintiffs demand trial by jury on all issues so triable herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the defendants for the

following:

(a)    Compensatory damages;

(b)    Consequential damages;

(c)    Punitive damages;

(d)    Statutory damages;

(e)    Advance payment of defense costs;

(f)    Indemnification;

(g)    A permanent injunction prohibiting Commerce, its agents, servants, officers, employees, attorneys, and all other persons in active concert or participation with Commerce from infringing, or causing any other person or entity to infringe, InterArch's copyrights;

(h)    Prejudgment and postjudgment interest;

(i)    Reasonable attorneys fees and cost of suit; and

(j)    Such other relief as is equitable.

Respectfully submitted,

_Andrew Sandler /JLB_

Andrew L. Sandler (D.C. Bar No. 387825)
Edward J. Meehan (D.C. Bar. No. 413993)
Joseph L. Barloon (D.C. Bar No. 459626)

46

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
202-371-7000
Attorneys for Plaintiff Vernon W. Hill, II


F. Joseph Warin (D.C. Bar No. 235978)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 995-8500
Attorneys for Plaintiffs Shirley Hill and InterArch, Inc.


Dated: January 14, 2008

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Vernon W. Hill, II,  Shirley Hill, and InterArch, Inc. | Dennis M. DiFlorio, Jack R. Bershad, Donald T. DiFrancesco, Robert D. Falese, Morton N. Kerr, Joseph Buckelew, John K. Lloyd, George E. Norcross, III, Daniel J. Ragone, William A. Schwartz, Jr., Joseph S. Vassalluzzo, Scott Hite, Commerce Bancorp, Inc., and Commerce Bank, N.A. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **88888**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **88888**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Andrew L. Sandler, Skadden, Arps, Slate, Meagher and Flom LLP, 1440 New York Avenue, NW, Washington, DC  20005-2111, (202) 371-7000

F. Joseph Warin, Gibson, Dunn & Crutcher LLP, 1050 Connecticut Avenue, N.W., Washington, D.C. 20036, (202) 995-8500

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN X IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

● 3 Federal Question
(U.S. Government Not a Party)

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A.** *Antitrust*

☐ 410 Antitrust

○ **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.** *General Civil (Other)*     **OR**     ○ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ⊙ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

17 U.S.C. ¤ 101 et seq., Copyright Infringement; Violation of the Fifth Amendment Right to Due Process

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  ☐  DEMAND $ TBD  Check YES only if demanded in compl.

JURY DEMAND:  YES ☒  NO ☐

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form

DATE  1/14/08    SIGNATURE OF ATTORNEY OF RECORD  _F. Joseph Gormley    Arthur Smalley_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Exhibit A



# AMENDED
# AND
# RESTATED
# EMPLOYMENT AGREEMENT

## COMMERCE BANCORP, INC.
## AND
## VERNON W. HILL, II

**EFFECTIVE DATE JANUARY 1, 2006**



# AMENDED AND RESTATED EMPLOYMENT AGREEMENT
## TABLE OF CONTENTS

BACKGROUND ...................................................................................................1

1.  Employment and Term of Employment. ...........................................2
   1.1  Five-Year Term...........................................................................2
   1.2  Conditions to Term......................................................................2
     (a)  Automatic Renewal and Extension. .....................................2
     (b)  Termination at Anniversary...................................................2
     (c)  Termination for Other Reasons. ...........................................2
   1.3  "Term" Definition.......................................................................2
   1.4  "Anniversary Date" Definition ...................................................2

2.  Services and Duties...........................................................................3
   2.1  Offices ........................................................................................3
   2.2  Duties .........................................................................................3
     (a)  Full Time and Best Efforts....................................................3
     (b)  Outside Activities..................................................................3

3.  Compensation....................................................................................3
   3.1  Compensation Definition ...........................................................3
   3.2  Base Salary ................................................................................3
     (a)  Payment.................................................................................3
     (b)  Adjustment.............................................................................4
   3.3  Plans and Programs....................................................................4
     (a)  Pro-Ration..............................................................................4
   3.4  Year.............................................................................................4
   3.5  Compensation Pro-Ration ..........................................................4

4.  Fringe and Other Benefits.................................................................4
   4.1  Generally Available Benefits ......................................................4
   4.2  Other Benefits............................................................................4
   4.3  Expenses....................................................................................4
   4.4  Indemnity....................................................................................4

**Commerce Bank**

5.   Disability and Death Compensation.................................................................5
 5.1   Permanent Disability .......................................................................5
 5.2   Disability Compensation .................................................................5
   (a)   *Monthly Disability Payments* .....................................................5
   (b)   *Disability Benefits* ..................................................................5
   (c)   *Partial Disability Compensation* .................................................5
 5.3   Death Compensation ......................................................................6
   (a)   *Termination of Employment and Regular Compensation.* ...............6
   (b)   *Death Benefit.* ........................................................................6
   (c)   *Life Insurance.* .......................................................................6

6.   Termination "For Cause" by Commerce. ..........................................................6
 6.1   "For Cause" Termination .................................................................6
   (a)   *Prior Written Notice* .................................................................6
   (b)   *Failure to Cure.* .......................................................................6
 6.2   "For Cause" Definition ....................................................................6
   (a)   *Conviction or Plea* ..................................................................6
   (b)   *Willful Violation* ......................................................................6
 6.3   Compensation on Termination "For Cause" .........................................7

7.   Termination "Without Cause" by Commerce. ......................................................7
 7.1   "Without Cause" Termination ..........................................................7
 7.2   "Without Cause" Definition ..............................................................7
 7.3   Compensation for Termination "Without Cause" ...................................7
   (a)   *Compensation through Termination Date* .....................................7
   (b)   *"Without Cause Severance Payment"* ..........................................7

8.   Termination "For Good Reason" by Hill. ...........................................................8
 8.1   "Good Reason" Termination .............................................................8
   (a)   *Prior Written Notice* .................................................................8
   (b)   *Failure to Cure.* .......................................................................8
 8.2   Compensation for "Good Reason" Termination .....................................8
   (a)   *Compensation through Termination Date* .....................................8
   (b)   *"Good Reason Severance Payment"* ............................................8

*Commerce Bank*

9.   "Change in Control" and "Good Reason"...........................................................8
9.1    Change in Control Definition ...............................................................8
   (a)     *Board Change* ........................................................................8
   (b)     *Beneficial Ownership Change.* ................................................9
9.2    Good Reason Definition ........................................................................9
   (a)     *Both a Change in Control and Other Reductions* ...............9
   (b)     *Material Breaches* ..............................................................10
   (c)     *Non-Assumption* ..................................................................10

10.    Additional Payments/Excise Taxes. ............................................................10
10.1   Gross-Up Payment ...............................................................................10
   (a)     *Tax is Determined Due* ........................................................10
   (b)     *Interest or Penalties are Incurred* .....................................10
10.2   Gross-Up Payment Determination .....................................................11
   (a)     *Cooperation* .........................................................................11
   (b)     *Calculations* ........................................................................11
   (c)     *Fees and Expenses.* .............................................................11
   (d)     *Payment Timing* ...................................................................11
   (e)     *Binding Effect.* .....................................................................11
   (f)     *Possible Underpayment* .......................................................11
10.3   Notice of IRS Claim .............................................................................12
   (a)     *Time and Content of Notice* .................................................12
   (b)     *Payment Timing* ...................................................................12
   (c)     *Contest Notice.* ....................................................................12
   (d)     *Other Contest Terms* ..........................................................13
10.4   Refund ....................................................................................................14
   (a)     *Denial of Refund* ..................................................................14

11.    Other Rights for Termination "Without Cause" or "For Good Reason" ......14
11.1   Other Benefits.......................................................................................14
   (a)     *Insurance*..............................................................................14
11.2   Plans and Program Rights....................................................................14
11.3   No Mitigation by Hill ............................................................................14

12.    Source of Payment and Timing..................................................................15
12.1   Source ....................................................................................................15
12.2   Time ........................................................................................................15

**Commerce Bank**

13.    Interest ....................................................................................................15

14.    Reimbursement of Enforcement Expenses ......................................15
  14.1    Failure to Pay..........................................................................15
  14.2    Failure to Provide ....................................................................15
  14.3    Further Conditions for Reimbursement ..................................15

15.    Confidential Information and Non-Competition. ...........................16
  15.1    Confidentiality..........................................................................16
    (a)    *Company Information Definition* ...............................16
    (b)    *Non-Disclosure and Non-Use* .................................16
  15.2    Commerce's Interests ..............................................................16
  15.3    Non-Competition and Time of Restrictions..............................16
    (a)    *Non-Competition* .....................................................16
    (b)    *Time of Restrictions* ...............................................17
  15.4    Remedies...................................................................................17
    (a)    *No Defense or Bar*...................................................17
    (b)    *Payments After Breach* ...........................................18
  15.5    Enforceability............................................................................18
  15.6    Commerce Definition ................................................................18

16.    Successions. ..........................................................................................18
  16.1    Successors/Assigns/Heirs.......................................................18
  16.2    Death .........................................................................................19
  16.3    Combinations.............................................................................19

17.    Notices. ...................................................................................................19
  17.1    Form of Notice ..........................................................................19
  17.2    Place of Notice..........................................................................19

18.    General Provisions. ...............................................................................20
  18.1    Entire Agreement ......................................................................20
  18.2    Amendments, Waivers and Termination ..................................20
  18.3    Alternate Payments ..................................................................20
  18.4    Benefits and Insurance .............................................................20
  18.5    "Person" Definition. ..................................................................20
  18.6    Counterparts..............................................................................20
  18.7    No Waiver...................................................................................21
  18.8    Assignment................................................................................21
  18.9    New Jersey Jurisdiction ............................................................21
    (a)    *Courts in Camden, NJ* .............................................21
    (b)    *Service of Process*...................................................21

iv

**Commerce Bank**

**18.10 Headings.** ................................................................................21
**18.11 Notice of Dispute and Cure**................................................................21
**18.12 New Jersey Law**................................................................................22

**SIGNATURES** ................................................................................22



## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This Amended and Restated Employment Agreement ("*Agreement*") is dated effective as of January 1, 2006, by and between:

> **COMMERCE BANCORP, INC.** ("*Commerce*"),
> a New Jersey business corporation,

>    and

> **VERNON W. HILL, II** ("*Hill*").

## BACKGROUND

A.    Hill is the Chairman, President and Chief Executive Officer ("*CEO*") of Commerce and of Commerce Bank, N.A. ("*CB*"), a national banking association and a wholly-owned subsidiary of Commerce.

B.    Hill and Commerce are parties to an Employment Agreement dated January 1, 1992 ("*Prior Agreement*") and wish to amend and restate it to reflect current circumstances, including reduction in Hill's base salary and to make his total compensation more incentive-based.

C.    The Board of Directors of Commerce (the "*Board*") has determined that the continued and future services of Hill will be of value to Commerce, CB and Commerce's other present and future subsidiaries, and has authorized this Agreement.

D.    Accordingly, the Board wishes to have Hill's services available to Commerce for at least five (5) years and to provide supplemental benefits to Hill should his employment with Commerce terminate under certain circumstances or should he die or become disabled before the termination of this Agreement.



NOW, THEREFORE, in consideration of the mutual covenants and agreements contained here, and intending to be legally bound, Commerce and Hill agree as follows:

**1.**    **Employment and Term of Employment.**

      1.1    **Five-Year Term.**  Commerce offers, and Hill accepts employment on all the terms and conditions of this Agreement, for a term of *five (5) years* beginning on the date stated above.

      1.2    **Conditions to Term.**  This five-year term is subject to:

        (a) *Automatic Renewal and Extension.*  On each Anniversary Date, this Agreement and Hill's employment shall automatically be renewed and extended (on the same terms and conditions) for a new five-year term *unless* written notice of Termination at Anniversary is given pursuant to Section 1.2(b) below.

        (b) *Termination at Anniversary.*  Either Commerce or Hill may terminate this Agreement on any Anniversary Date by giving to the other party written notice of termination no later than *November 1 before any such Anniversary Date*.  If such prior notice is given to either party, then the Term will have *four (4) years remaining after the applicable Anniversary Date*, subject to the terms and conditions of this Agreement.

        (c) *Termination for Other Reasons.*  This Agreement may be terminated on Death, "For Cause", "Without Cause", or for "Good Reason" as described in Sections 5-8 below.

      1.3    **"Term" Definition.**  "*Term*" means the original five-year employment period, as well as any renewed or extended periods as provided for in this Agreement.

      1.4    **"Anniversary Date" Definition.**  "*Anniversary Date*" means *January 1, 2007*, as well as *each annual January 1 thereafter* if this Agreement is automatically renewed or extended.

VWH II



## 2.    Services and Duties.

2.1    **Offices**.  During the Term, Hill shall be employed as *Chairman, President and CEO of Commerce*.  Subject to the approval of the CB Board of Directors, during the Term, Hill shall also serve as the *Chairman of the Board, President and CEO of CB*.  Subject to the approval of the respective Boards of Directors, during the Term, Hill shall also serve as an officer and/or director of such other subsidiaries of Commerce as such Board of Directors, with the consent of Hill, shall designate.

2.2    **Duties**.  As the Chairman of the Board, President and CEO of Commerce, Hill shall have primary responsibility for all operations of Commerce and its subsidiaries subject to the oversight of the respective Boards of Directors, provided that such duties are consistent with his present duties.

(a) *Full Time and Best Efforts*.  Hill accepts such duties, will devote his full time and best efforts to the business and affairs of Commerce and its subsidiaries, and will use his best efforts to promote the interests of Commerce and its subsidiaries.

(b) *Outside Activities*.  Hill also has participated in and shall have discretion to participate in other outside activities.  Such outside activities are expressly permitted, and shall be in addition to and notwithstanding Hill's obligation of full time and best efforts as described in Section 2.2(a).

## 3.    Compensation.

3.1    **Compensation Definition**.  *"Compensation"* means the sum of the highest annual rate of base salary (described in Section 3.2) and highest cash bonus (described in Section 3.3) paid to Hill during the most recent twenty-four (24) months of the Term.

3.2    **Base Salary**.  Commerce shall pay Hill *"base salary"* at the rate of not less than *$1,000,000 per year* for all services to be rendered by him under this Agreement and for all positions held by him during the Term.

(a) *Payment*.  Base salary is payable at regular intervals in accord with Commerce's normal payroll practices now or later in effect.

VWH II



(b) *Adjustment*.  Base salary is subject to an annual review and such upward adjustments as may be deemed appropriate by the Board or a Board-designated Committee.  The Board or such Committee may recommend an increase in base salary for Hill, but shall have no obligation to do so.  Base salary may not be decreased without Hill's written consent.

    3.3    **Plans and Programs**.  During the Term, Hill shall be entitled to participate in any cash or other bonus programs, incentive compensation plans, stock option plans or similar benefit or compensation programs now or later in effect that are generally made available to executive officers of Commerce.

    (a) *Pro-Ration*.  For any period less than a full year during the Term, Hill shall receive an amount equal to the prorated portion of any payment pursuant to such plan or program.

    3.4    **Year**.  A "year" commences on January 1, 2006, and on January 1 of each subsequent calendar year.

    3.5    **Compensation Pro-Ration**.  Compensation for a portion of a year shall be pro-rated.

**4.**    <u>**Fringe and Other Benefits**</u>.  During the Term, Hill shall also be entitled to.

    4.1    **Generally Available Benefits**.  Participate in all fringe benefits as then in effect that are generally available to Commerce's executive officers including, without limitation, medical and hospitalization coverage, life insurance coverage and disability coverage, and Supplemental Executive Retirement Plan ("SERP") coverage;

    4.2    **Other Benefits**.  Such other fringe benefits as the Board, or a Board-designated Committee, shall deem appropriate; provided that such benefits are consistent with those that he currently enjoys including, without limitation, use of an automobile, paid holidays and vacations, and club memberships;

    4.3    **Expenses**.  Reimbursement by Commerce for all expenses incurred by Hill which Commerce determines to be reasonable and necessary (in accord with its normal reimbursement practices now or later in effect) for Hill to carry out his duties under this Agreement; and

    4.4    **Indemnity**.  Indemnification by Commerce to the fullest extent permitted by governing law and in accord with Commerce's bylaws and policies, against all claims concerning Hill's status as an officer, director, employee, or agent of Commerce.

**Commerce Bank**

## 5.    Disability and Death Compensation.

   5.1    **Permanent Disability**.  Hill shall be deemed to have become *"permanently disabled"* upon his failure to render services of the character contemplated by this Agreement, because of his physical or mental illness or other incapacity beyond his control, other than his death, for a continuous period of 6 months, or for shorter periods aggregating more than 9 months in any 18 consecutive months.

   5.2    **Disability Compensation**.  Commerce shall compensate Hill for the balance of the Term at *a rate equal to 70% of his Compensation* at the time Hill becomes permanently disabled while employed during the Term.

      (a) *Monthly Disability Payments*.  Commerce shall make the payments due under this Section 5.2 on the first day of each month, starting with the first day of the month following the month in which Hill is deemed to be permanently disabled, in an amount equal to *1/12 of 70% of Hill's Compensation* at the time he is deemed to be permanently disabled.

         (i) *Insurance Reductions*.  Monthly Disability Payments shall be reduced each month, however, by the amount of any disability payments made to Hill under any Commerce-sponsored disability insurance plan. The amount of the reduction under the preceding sentence shall be computed as if Hill had elected to receive monthly payments of disability benefits (regardless of the actual payment frequency).

      (b) *Disability Benefits*.  After becoming permanently disabled as provided in this Section 5, Hill shall nonetheless continue until the end of the Term to be entitled to receive at Commerce's expense such group hospitalization coverage, life insurance coverage and disability coverage as is generally made available from time to time to executive officers of Commerce, if and to the extent permitted by the respective insurers of such coverage.

      (c) *Partial Disability Compensation*.  Hill shall continue to receive his full Compensation if he is partially disabled and until such time as Hill is deemed to be permanently disabled.

VWH II



5.3    **Death Compensation**.  If Hill dies during the Term, then:

(a) *Termination of Employment and Regular Compensation*.  Hill's employment and rights to Compensation described above shall automatically terminate at the close of the calendar week in which death occurs; and

(b) *Death Benefit*.  Commerce shall pay to such person as Hill shall designate in a notice filed with Commerce or, if no such person shall be designated, to his estate, in addition to his full Compensation due under Section 5.3(a), a *lump sum "Death Benefit"* in an amount equal to *the product of three (3) times Hill's Compensation at the time of his death.*

(c) *Life Insurance*.  The foregoing "Death Benefit" shall be in addition to any amount payable under any group life insurance program maintained by Commerce or CB.

6.    **Termination "For Cause" by Commerce.**

6.1    **"For Cause" Termination**.  Commerce shall have the right at any time to terminate Hill's employment *"For Cause"* only if:

(a) *Prior Written Notice*.  Commerce shall give Hill not less than thirty (30) days prior written notice of its intention to terminate his employment specifying in detail the reason(s) for such termination and the date of termination; and

(b) *Failure to Cure*.  After receipt of such notice, Hill fails to cure, cease or remedy the reason(s) for such termination before the date of termination stated in such notice.

6.2    **"For Cause" Definition**.  *"For Cause"* means only the following at any time during the Term:

(a) *Conviction or Plea*.  If Hill is convicted of or enters a plea of guilty or *nolo contendre* to, a felony, a crime of falsehood or a crime involving fraud, moral turpitude or dishonesty; or

(b) *Willful Violation*.  If Hill willfully violates any of the terms or provisions of this Agreement, including, without limitation:

VWH II



(i) Hill's willful failure to perform his duties in Section 2.2 above and this Agreement or the Board's instructions after written notice of such instructions (other than any such failure resulting from Hill's incapacity due to illness or disability); or

(ii) Hill engages in any conduct materially harmful to Commerce's business.

6.3    **Compensation on Termination "For Cause".**    Commerce shall pay Hill *any prorated portion of his full Compensation that is then owed* through the date of termination if Hill's employment shall terminate "For Cause" and *Commerce shall have no further obligations to Hill under this Agreement* other than to pay Hill such other plan, program, or other benefits as may be due Hill pursuant to Sections 3.3 and 4 above.

7. **Termination "Without Cause" by Commerce.**

7.1    **"Without Cause" Termination.**    Commerce shall have the right to terminate Hill's employment *"Without Cause"* by giving not less than thirty (30) days prior written notice of its intention to terminate his employment "Without Cause" pursuant to this Section 7.

7.2    **"Without Cause" Definition.**    Termination *"Without Cause"* means any reason other than by either Termination "For Cause" (Section 6 above), or Termination at Anniversary (Section 1.2(b) above).

7.3    **Compensation for Termination "Without Cause".**    Commerce shall pay Hill the following if Commerce terminates Hill's employment "Without Cause":

(a) *Compensation through Termination Date.*    Any pro-rated portion of his full Compensation through the date of termination; and

(b) *"Without Cause Severance Payment".*    A lump sum severance payment (the *"Without Cause Severance Payment"*) in lieu of any further Compensation payments to Hill after the date of termination.

(i) *"Without Cause Severance Payment"* means the sum of Hill's full Compensation that would still be remaining until the end of the then Term had Hill continued to be employed by Commerce to the end of the then Term.



**8.    Termination "For Good Reason" by Hill.**

8.1    **"Good Reason" Termination.**  Hill shall have the right to terminate his employment "***For Good Reason***" (as defined in Section 9.2 below) if:

(a) ***Prior Written Notice.***  Hill shall first give Commerce not less than thirty (30) days prior written notice of his intention to terminate his employment specifying the reason(s) for such termination and the date of termination; and

(b) ***Failure to Cure.***  After receipt of such notice, if Commerce fails to cure, cease or remedy the reason(s) for such termination before the date of termination stated in such notice.

8.2    **Compensation for "Good Reason" Termination.**  Commerce shall pay to Hill the following if Hill terminates his employment "***For Good Reason***" (defined in Section 9.2):

(a) ***Compensation through Termination Date.***  Hill's full Compensation through the termination date; and

(b) "***Good Reason Severance Payment***".  A lump sum "***Good Reason Severance Payment***" in lieu of any further Compensation payments to Hill after the date of termination.

(i) "***Good Reason Severance Payment***" means a lump sum equal to four (4) times Hill's Compensation immediately preceding such termination.

**9.    "Change in Control" and "Good Reason".**

9.1    **Change in Control Definition.**  "***Change in Control***" or "***Change of Control***" means a change in control of Commerce or CB of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), or any successor provisions under the Exchange Act, whether or not Commerce or CB is subject to such reporting requirement; *provided that,* without limitation, such a change in control shall have been deemed to occur conclusively when any of the following events shall have occurred without Hill's prior written consent:

(a) ***Board Change.***  Within any period of two (2) consecutive years during the Term, there is a change in at least a majority of the members of the Board or the addition of five or more new members to the Board, *unless* such change or addition occurs with the affirmative vote in writing of Hill in his capacity as a director or a shareholder; or

VWH II



(b) *Beneficial Ownership Change.* A Person or group acting in concert as described in Section 13(d)(2) of the Exchange Act holds or acquires beneficial ownership within the meaning of Rule 13d-3 promulgated under the Exchange Act of a number of common shares of Commerce which constitutes either:

(i)    more than fifty (50%) percent of the shares which voted in the election of directors of Commerce at the shareholders' meeting immediately preceding such determination; or

(ii)    more than thirty (30%) percent of Commerce's outstanding common shares. For this Section 9.1(b)(ii), unexercised warrants or options or unconverted nonvoting securities shall count as constituting beneficial ownership of Commerce's common shares into which the warrants or options are exercisable or the nonvoting convertible securities are convertible, notwithstanding anything to the contrary contained in Rule 13d-3 of the Exchange Act.

9.2    **Good Reason Definition.** "*Good Reason*" means:

(a) *Both a Change in Control and Other Reductions*. Both a "*change in control*" of Commerce (as defined in Section 9.1 above); **and** if any of the following "*Other Reductions*" occur *within three (3) years after such change in control* without Hill's prior written consent:

(i) *Reduction of Authority.* The nature and scope of Hill's authority with Commerce or a surviving or acquiring Person are materially reduced to a level below that which he enjoys when the change in control occurs;

(ii) *Materially Inconsistent Duties.* The duties and responsibilities assigned to Hill are materially inconsistent with that which he enjoys when the change in control occurs;

(iii) *Materially Reduced Benefits.* The fringe benefits which Commerce provides Hill are materially reduced to a level below that which he enjoys when the change in control occurs;

(iv) *Reduction of Position or Title.* Hill's position or title with Commerce or the surviving or acquiring Person is reduced from his current position or title with Commerce when the change in control occurs; or

VWH II



(v) *Transfer or Offices and Relocation.* Any relocation or transfer of Commerce's principal executive offices to a location more than fifty (50) miles from Hill's principal residence on the date when the change in control occurs; or, if Hill is required, without his prior written consent, to relocate more than fifty (50) miles from his principal residence when the change in control occurs.

(b) ***Material Breaches.*** Commerce materially breaches this Agreement; or

(c) ***Non-Assumption.*** There is a failure or refusal of any successor to Commerce to assume all duties and obligations of Commerce under this Agreement.

## 10.    Additional Payments/Excise Taxes.

10.1    **Gross-Up Payment.** Notwithstanding anything in this Agreement to the contrary or any termination of this Agreement, *Hill shall be entitled to receive an additional payment* (a "***Gross-Up Payment***") if:

(a) ***Tax is Determined Due.*** It shall be determined that any payment or distribution or benefit made or provided by Commerce or its affiliates to or for the benefit of Hill, whether pursuant to this Agreement or some other plan or otherwise, including income recognized by the exercise of options to buy Commerce stock, and determined without regard to any additional payments required under this Section 10 (a "***Payment***"), would be an excess Parachute Payment that is not deductible by Commerce for federal income tax purposes and subject to an excise tax; or

(b) ***Interest or Penalties are Incurred.*** Any interest or penalties are incurred by Hill concerning such excise tax.

(i) *Excise Tax Definition.* "***Excise Tax***" means both: any excise tax imposed on any Compensation payments due to Hill – including Death Benefit, Compensation for Termination "Without Cause" or "For Good Reason" under Sections 5.3(b), 7.3 or 8.2 above – because of Section 280G and Section 4999 of the Internal Revenue Code of 1986 as amended (the "***Code***") or any successor Code provision, or any state or local law; and interest or penalties incurred concerning such excise tax.



(ii) *Gross-Up Payment Definition.* *"Gross-Up Payment"* means any amount of additional payments to Hill that are needed so that Hill incurs no out-of-pocket expense for Excise Taxes, and to place Hill in the same position after all federal and state taxes – including all income tax, Excise Tax, employment or other tax or any penalties and interest – that Hill would have been in if:  (a) Hill did not have to pay the Excise Tax; (b) the Excise Tax did not apply for reasons other than Sections 280G and 4999 of the Code; and (c) Hill did not have to pay any interest or penalty charge for the imposition of any portion of the Excise Tax.

10.2  **Gross-Up Payment Determination.**  All determinations required to be made under this Section 10, including whether and when a Gross-Up Payment is required, the amount of such Gross-Up Payment, the calculations under Section 280G and 4999 of the Code, and the assumptions to be used in arriving at such determination, shall be made by Commerce's independent auditor or another nationally recognized accounting firm chosen by the auditor with the consent of Commerce and Hill (the "*Accounting Firm*").

(a) *Cooperation.*  Commerce and Hill shall cooperate with Accounting Firm and provide information needed for the determination.

(b) *Calculations.*  Accounting Firm shall provide detailed supporting calculations both to Commerce and Hill *within fifteen (15) business days* of the receipt of notice from Hill that there has been a Payment or receipt of Notice of IRS claim under Section 10.3, or such earlier time as is requested by Commerce.

(c) *Fees and Expenses.*  Commerce shall pay all fees and expenses of the Accounting Firm for services for this determination.

(d) *Payment Timing.*  Commerce shall pay any Gross-Up Payment, as determined pursuant to this Section 10, to Hill *within five (5) days* of the receipt of the Accounting Firm's determination.

(e) *Binding Effect.*  Any determination by the Accounting Firm shall be binding upon Commerce and Hill.

(f) *Possible Underpayment.*  As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm, it is possible that Commerce may not make Gross-Up Payments that should be made ("*Underpayment*").

Employment Agreement                    Page 11 of 22

VWH II



(i) *Determination.*   If Commerce exhausts its remedies pursuant to Section 10.3 and Hill is later required, directly or indirectly, to make a payment of any Excise Tax, then the Accounting Firm shall determine the amount of the Underpayment that has occurred. Such amount shall be sufficient to put Hill in the same position after all federal and state taxes – including all income tax, Excise Taxes, employment, or other taxes, and all penalties and interest on such taxes – as Hill would have been in if there had been no Underpayment and Commerce had made appropriate Gross-Up Payment in the first instance.

(ii) *Payment.*  Commerce shall promptly pay to Hill or for the benefit of Hill any amounts determined by Accounting Firm to be needed to satisfy any Underpayment.

10.3   **Notice of IRS Claim.**  Hill shall notify Commerce in writing of any claim by the Internal Revenue Service ("*IRS*") that, if successful, would require the payment by Commerce of the Gross-Up Payment.

(a) ***Time and Content of Notice.***  Such notification shall be given as soon as practicable but not later than *ten (10) business days* after Hill is informed in writing of such claim and shall apprise Commerce of the nature of such claim and the date on which such claim is requested to be paid.

(b) ***Payment Timing.***  Hill shall not pay such IRS claim until thirty (30) days after the date on which he gives such notice to Commerce (or such shorter period ending on the date that any payment of taxes on such claim is due).

(c) ***Contest Notice.***  If Commerce notifies Hill in writing before the expiration of such thirty (30) day period that it desires to contest such IRS claim, then Hill shall:

(i) Give Commerce any information reasonably requested by Commerce relating to such IRS claim;

(ii) Take such action in connection with contesting such IRS claim as Commerce shall reasonably request in writing, including, without limitation, accepting legal representation for such IRS claim by an attorney reasonably selected by Commerce;

(iii) Cooperate with Commerce in good faith in order to effectively contest such IRS claim; and

(iv) Permit Commerce to participate in any proceedings on such IRS claim.



(d) *Other Contest Terms*.   Without limitation on the foregoing provisions of this Section 10.3:

(i) Commerce shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold Hill harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses.

(ii) Commerce shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forgo any and all administrative appeals, proceedings, hearing and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct Hill to pay the tax claimed and sue for a refund or contest the IRS claim in any permissible manner;

(iii) Hill agrees to prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as Commerce shall determine;

(iv) If Commerce directs Hill to pay such IRS claim and sue for a refund, then Commerce shall advance the amount of such payment to Hill on an interest-free basis and shall indemnify and hold Hill harmless, on an after-tax basis, from any Excise Tax or income tax (including interest penalties) imposed regarding such advance or regarding any imputed income with respect to such advance;

(v) Any extension of the statute of limitations relating to payment of taxes for the taxable year of Hill with respect to which such contested amount is claimed to be due is limited solely to such contested amount.

(vi) Commerce's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable under this Section 10 and Hill shall be entitled to settle or contest, as the case may be, any other issue raised by the Internal Revenue Service or any other taxing authority.



10.4   **Refund.**   Hill shall [subject to Commerce's complying with the requirements of Section 10.3] promptly pay to Commerce the amount of any refund actually received, including any interest paid or credited after applicable taxes if, after the receipt by Hill of an amount advanced by Commerce pursuant to Section 10.3, Hill becomes entitled to receive any refund for such IRS claim.

(a)   *Denial of Refund.*   If, after the receipt by Hill of an amount advanced by Commerce pursuant to Section 10.3, a determination is made that Hill shall not be entitled to any refund for such IRS claim and Commerce does not notify Hill in writing of its intent to contest such denial of refund before the expiration of thirty (30) days after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset the amount of Gross-Up Payment required to be paid.

## 11.   Other Rights for Termination "Without Cause" or "For Good Reason".

11.1   **Other Benefits.**   Hill shall be entitled to the following from Commerce, in addition to the other Compensation stated in either Section 7.3 or 8.2 above, if Hill's employment is terminated either *"Without Cause"* or *"For Good Reason"* as set forth in either Section 7.1 or 8.1 above:

(a) *Insurance.*   Following the date of termination, Hill shall be entitled to participate in all Commerce medical, disability, hospitalization and life insurance benefits for a period of three (3) years:

(i)   *Exception.*   If Hill accepts subsequent employment during the three-year period following the date of termination, then continuation of any medical, disability, hospitalization and life insurance benefits will be offset by coverages provided through Hill's subsequent employer.

(b) *Options Vest.*   Any outstanding options held by Hill to purchase Commerce stock shall vest as of the date of termination of Hill's employment.

11.2   **Plans and Program Rights.**   Nothing in this Agreement shall affect or have any bearing on Hill's entitlement to other benefits under any plan or program providing benefits by reason of termination of employment.

11.3   **No Mitigation by Hill.**   Hill shall not be required, under any circumstance including provision in this Agreement, to mitigate the amount of any Compensation or payment provided for in this Agreement by seeking other employment.



## 12.   Source of Payment and Timing.

12.1   **Source**.  All payments under this Agreement shall be paid in cash from the general funds of Commerce.

(a) No special or separate fund shall be required to be established and Hill shall have no right, title or interest whatsoever in or to any investment which Commerce may make to aid Commerce in meeting its obligations here, *except* to the extent that Commerce shall, in its sole and absolute discretion, choose to designate any of its rights it may have under one or more life insurance policies it may obtain to cover any of its obligations under this Agreement.

(b) Nothing in this Agreement, and no action taken pursuant to it, shall create or be construed to create a trust of any kind or fiduciary relationship between Commerce and Hill or any other Person.

12.2   **Time**.  All payments due Hill under Sections 5.2, 6.3, 7.3 or 8.2 above shall be made not later than the thirtieth (30th) day following the date of termination of employment.

## 13.   Interest.  Hill shall be entitled (in addition to his other rights and remedies) to interest on past due amounts at a rate equal to two percentage points (2%) above the prime rate charged from time to time by CB if any benefits due to Hill are not paid when due with such interest to commence on the date a benefit was due.

## 14.   Reimbursement of Enforcement Expenses.  Hill shall be entitled to full reimbursement from Commerce for all costs and expenses (including reasonable attorneys' fees, costs, and interest as stated in Section 13) incurred by Hill in enforcing his rights under this Agreement if the following exist:

14.1   **Failure to Pay**.  Commerce fails to pay or provide Hill any of the amounts due him under this Agreement; or

14.2   **Failure to Provide**.  Commerce fails to provide Hill with any of the other benefits due him under this Agreement; and

14.3   **Further Conditions for Reimbursement**. *Provided that:*

(a) Commerce does not cure any such failure within thirty (30) days after having received written notice from Hill of such failure; and



(b) there is an adjudication that Hill's action in enforcing his rights are not frivolous.

## 15.    Confidential Information and Non-Competition.

### 15.1    Confidentiality.

(a) *Company Information Definition*.    "*Company Information*" means all data relating to Commerce's business that is not generally published or available to the public, including writings, equipment, processes, drawings, strategic plans, reports, manuals, inventions, records, financial information, business plans, customer lists, the identity of and other facts concerning prospective customers, inventory lists, arrangements with suppliers and customers, computer programs, or other materials embodying trade secrets, customer product information, or technical or business information of Commerce.

(b) *Non-Disclosure and Non-Use*.    During the Term or any later time, except with the prior written consent of Commerce's Board, Hill shall not, directly or indirectly:

(i) *Non-Disclosure*.    Disclose, communicate or divulge Company Information to any Person other than authorized Commerce personnel;

(ii) *Non-Use*.    Use Company Information for the benefit of himself or any other Person, other than authorized Commerce personnel.

### 15.2    Commerce's Interests.    Hill will not, during the Term, except with the express prior written consent of Commerce's Board, directly or indirectly, in any capacity (including but not limited to employee, owner, partner, consultant, agent, director, officer, shareholder or in any other capacity) engage in or assist any Person to engage in any act or action which he, acting reasonably, believes or should believe would be harmful or inimical to the interests of Commerce.

### 15.3    Non-Competition and Time of Restrictions.

(a) *Non-Competition*.    Hill will not, except with the express prior written consent of Commerce's Board, in any capacity (including, but not limited to, owner, partner, shareholder, consultant, agent, employee, officer, director or otherwise), directly or indirectly, for his own account or for the benefit of any Person:



(i) *Business and Geographic Restriction.* Establish, engage or participate in or otherwise be connected with any commercial banking business which conducts business in any geographic area in which Commerce and its subsidiaries is then conducting such business.

(ii) *Exception.* The foregoing shall not prohibit Hill from owning as a shareholder less than 5% of the outstanding voting stock of an issuer engaged in the commercial banking business.

(b) *Time of Restrictions.* The non-competition restrictions in Section 15.3 shall start on the effective date of this Agreement and end as stated below for the appropriate circumstance.

(i) *Hill's Termination at Anniversary or Voluntary.* If this Agreement is terminated by Hill in accord with the Termination at Anniversary in Section 1.2(b) of this Agreement or if Hill voluntarily terminates his employment, *then the non-competition restriction ends one year following the effective date of termination of Hill's employment under this Agreement;*

(ii) *Commerce's Termination at Anniversary.* If this Agreement is terminated by Commerce in accord with the provisions of Section 1.2(b) of this Agreement, *then the non-competition restriction ends on the effective date of termination of Hill's employment under this Agreement;*

(iii) *Termination "For Cause".* If Commerce terminates this Agreement "For Cause" in accord with Section 6 of this Agreement, *then the non-competition restriction ends on the effective date of termination of Hill's employment under this Agreement;* or

(iv) *Termination "Without Cause" and "For Good Reason".* If this Agreement is terminated "Without Cause" or "For Good Reason" in accord with either Section 7.1 or 8.1 above, *then the non-competition restriction ends on the effective date of termination of Hill's employment under this Agreement.*

15.4    **Remedies.** Any breach by Hill of any of the terms in this Section 15 will result in irreparable injury to Commerce for which money damages could not adequately compensate Commerce; and, thus, in the event of any such breach, Commerce shall be entitled (in addition to any other rights and remedies which it may have at law or in equity) to have an injunction issued by any competent court enjoining and restraining Hill and/or any other Person involved from continuing such breach.

(a) *No Defense or Bar.* The existence of any claim or cause of action which Hill may have against Commerce or any other Person (other than a claim for Commerce's breach of this Agreement for failure to make payments) shall not constitute a defense or bar to the enforcement of the terms in this Section 15.

VWH II



(b) **Payments After Breach.** In the event of any alleged breach by Hill of any of the terms in this Section 15, Commerce shall continue any and all of the payments due Hill under this Agreement until such time as a Court shall enter a final and unappealable order finding such a breach.

(i) *Exception.* The foregoing shall not preclude a Court from ordering Hill to repay such payments made to him for the period after the breach is determined to have occurred or from ordering that payments under this Agreement be permanently terminated in the event of a material and willful breach.

15.5 **Enforceability.** If any portion of the terms in this Section 15, or their application, is construed to be invalid or unenforceable, then the other portions of such terms or their application shall not be affected and shall be given full force and effect without regard to the invalid or unenforceable portions to the fullest extent possible.

(a) If any term in this Section 15 is held to be unenforceable because of the area covered, duration, or scope, then Hill and Commerce expressly and intentionally authorize the court making such determination to reduce the area and/or duration and/or limit the scope to an enforceable term, so that the term shall then be enforceable in its reduced form.

15.6 **Commerce Definition.** For this Section 15, the term *"Commerce"* means Commerce, any successor of Commerce under Section 16 below, and all present and future direct and indirect subsidiaries and affiliates of Commerce including, but not limited to, CB.

16. **Successions.**

16.1 **Successors/Assigns/Heirs.** This Agreement shall inure to the benefit of and be binding on:

(a) Commerce and Hill and their respective heirs, executors, administrators, successors and assigns; and

(b) Any corporate or other successor of Commerce that acquires, directly or indirectly, by combination, merger, consolidation, purchase, or otherwise, all or substantially all of the assets of Commerce.



16.2 **Death**. On Hill's death, except for the "Death Benefit" governed by payment described in Section 5.3 above, any payments or benefits otherwise due Hill shall be paid to or be for the benefit of Hill's legal representatives for his estate.

16.3 **Combinations**.   Nothing in the Agreement shall preclude Commerce from combining, consolidating or-merging into or with or transferring all or substantially all of its assets to another Person ("***Combination***").

(a) In the event of a Combination, such other Person shall be deemed to assume this Agreement and all obligations of Commerce in this Agreement.

(b) Upon such a Combination, the term "Commerce" shall mean such other Person and this Agreement shall continue in full force and effect.

## 17.   Notices.

17.1 **Form of Notice**.   All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if delivered by:  hand with delivery receipt; or certified or registered mail, return receipt requested, with postage prepaid; or overnight or express courier with a receipt-for-delivery tracking system.

17.2 **Place of Notice**.  All notices are to be delivered to the following addresses or to such other address as either party may designate in writing by like notice:

A.   If to Hill, to:

Vernon W. Hill, II
Villa Collina
262 East Main Street
Moorestown, NJ  08057-2906

B.   If to Commerce, to:

Commerce Bancorp, Inc.
Commerce Atrium
1701 Route 70 East
Cherry Hill, New Jersey  08034-5400

Attn:   Chairman, Compensation Committee
Board of Directors

VWH II



## 18.    <u>General Provisions.</u>

18.1   **Entire Agreement**.    This Agreement constitutes the entire agreement between Commerce and Hill concerning its subject matter.  It supersedes and replaces all prior discussions, representations, promises or agreements, whether written or oral, express or implied, between Hill and Commerce or their representatives, including the Prior Agreement.

18.2   **Amendments, Waivers and Termination.**  No amendment, waiver or termination of any of the provisions of this Agreement shall be effective unless in writing and signed by the party against whom it is sought to be enforced. Any written amendment, waiver or termination of this Agreement executed by Commerce and Hill (or his legal representatives) shall be binding upon them and upon all other Persons, without the necessity of securing the consent of any other Person including, but not limited to, Hill's wife, and no Person shall be deemed to be a third party beneficiary under this Agreement except as provided under Section 16 above.

18.3   **Alternate Payments**.   Instead of Commerce, either CB or any other subsidiary of Commerce may make payments to Hill and, to the extent such payments are so made, Commerce shall be released of its obligations to make such payments.

18.4   **Benefits and Insurance**.   The benefits provided under this Agreement shall be in addition to and shall not affect the proceeds payable to Hill's beneficiaries under group life insurance policies which Commerce may be carrying on Hill's life.

18.5   **"Person" Definition.**  *"Person"* means a natural person, joint venture, corporation, sole proprietorship, trust, estate, partnership, cooperative, association, non-profit organization or any other legal entity.

18.6   **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same Agreement.

VWH II



18.7 **No Waiver**.    Except as otherwise expressly stated in this Agreement, no failure on the part of any party to this Agreement to exercise and no delay in exercising any right, power or remedy under this Agreement shall operate as a waiver; nor shall any single or partial exercise of any right, power or remedy under this Agreement preclude any other or further exercise of any of or the exercise of any other right, power or remedy.

18.8 **Assignment**.    Without Commerce's prior written consent and approval, neither this Agreement nor any of its rights to receive payments shall be voluntarily or involuntarily:

(a) Assigned, transferred, alienated, encumbered or disposed of, in whole or in part; or

(b) Subject to anticipation, levy, execution, garnishment, attachment by, or interference or control of, any creditor.

18.9 **New Jersey Jurisdiction**.    Commerce and Hill irrevocably, voluntarily, knowingly and expressly consent to:

(a) *Courts in Camden, NJ*.  The exclusive jurisdiction of the Superior Court, Law Division, Camden County, New Jersey or the United States District Court for the District of New Jersey, Camden Vicinage, to enforce this Agreement, or to resolve any claim, controversy or dispute involving it; and

(b) *Service of Process*.  Service of process as set forth in the Notice stated in Section 17 above.

18.10 **Headings**.  The headings of the sections of this Agreement have been inserted for convenience and clarity.  They do not restrict or modify any of the terms or provisions of this Agreement.

18.11 **Notice of Dispute and Cure**.  If Commerce or Hill has a dispute or claim under this Agreement, then that dispute or claim shall be described with specificity in writing; and, the party receiving such written notice shall have thirty (30) business days to cure the dispute or claim.

VWH II



18.12 **New Jersey Law.** This Agreement shall be governed and construed, and the legal relationships of the parties determined, in accordance with the laws of the State of New Jersey applicable to contracts executed and to be performed solely in the State of New Jersey.

**COMMERCE BANCORP, INC.**

(Corporate Seal)                3/14/06  By: _____

                                Attest: _____  3/14/06

                        3/14/06  _____  (SEAL)
                                 **Vernon W. Hill, II**

Exhibit B



# MASTER AGREEMENT FOR ARCHITECTURAL/ENGINEERING/ CONSULTANT SERVICES

This Master Agreement (the "Agreement") is entered into as follows:

Agreement Date for Reference Purposes:  _____ January 1, 2006 _____

Agreement Term:  January 1, 2006  to December 31, 2006

Owner/Developer:  **Commerce Bank**

Address:  9000 Atrium Way
Mount Laurel, NJ 08054

Consultant:  InterArch

Address:  11009 Atrium Way
Mount Laurel, NJ 08054

Phone:  856-439-9000    Fax 856-439-9005

E-mail:  IA@SSH-INC.Com    Vendor No. 5587

Consultant agrees to provide professional services ("Services"), as hereinafter described in this Master Agreement.

## Article 1 - PROJECT SCOPE OF SERVICES

**A.  Branch Plan- New Prototype**

Maintenance and use of each new prototypical branch    $ 5,000.00
Interior design of each new prototype    $ 5,000.00

**B.  Branch Plan- Interior Renovations**

Interior renovation plan for a prototype branch or a non-prototype branch will be provided on an hourly basis based on the hourly schedule attached.

**C.  Interior Design Services**

Services will be provided for non-prototype branch interior design on an hourly fee basis based on the hourly schedule attached.

**D.  Architectural Services**

Architectural Services will be provided on an hourly basis based on the hourly schedule attached.

**E.  Landscape Architectural Services**

Landscape Architectural Services will be provided on an hourly fee basis based on the hourly schedule attached.

**F.  Construction Management**

Construction Management Services shall be provided on an hourly basis based on the hourly schedule attached.

**G.  Computer Aided Facilities Management (CAFM) Services**

Scope of Services for Computer Aided Facilities Management per InterArch Proposal dated September 29, 2005 attached Addendum A

1. Creation of the database, including bringing it to a current status, will be billed by InterArch on an hourly basis.

2. InterArch will operate and maintain the system on an ongoing basis at a fixed monthly fee of $10,000/ month beginning February 1, 2006 or a date mutually agreed to by Owner/Developer and Consultant.

**H.  Additional Consultant Services**

Described below is the nature and scope of any Services not described above and such additional information as appropriate.

_____
_____
_____
_____
_____
_____
_____
_____
_____

Additional services ("Additional Services") may be required because of unusual Site conditions or local code or other regulatory requirements. These additional services shall be described in Article 1.C below and set forth in an Amendment as contemplated in Article 2.

## Article 2 - ADDITIONAL SERVICES PER AMENDMENT

Consultant agrees that it shall furnish Additional Services as authorized and confirmed by execution of any amendment to this Agreement ("Amendment"). Any Amendment shall be in writing, and shall be executed by Consultant and Owner/Developer prior to the commencement by Consultant of any Additional Services. The method and amount of compensation for Additional Services shall be based upon a fixed fee, the hourly rates for Consultant's services and personnel set forth below, or any combination thereof.

SERVICES/PERSONNEL    RATE/HOUR
___ "See Addendum B 2006 Rate Schedule" ___    $_____
                                                $_____
                                                $_____

## Article 3 - SCHEDULE

The Services shall be rendered in accordance with the following schedule:

_____
_____
_____
_____

## Article 4 - REIMBURSABLE EXPENSES

The following expenses ("Reimbursable Expenses") shall be reimbursed to Consultant to the extent same are direct out-of-pocket expenses of consultant, its employees and/or contractors incurred in connection with the Project and subject to prior authorization as noted:

A.  Reproductions charges shall be billed at actual cost and shall be consistent with Commerce Bank's established pricing with Ridgway's. Invoices shall be provided to support all charges upon request.

Document pricing shall be invoiced at the following rates:

$1.00 per Square Foot for roll bonds (Plotter)

B.  Postage and handling of drawings, specifications and other documents; overnight shipping, faxes

C.  Expense of transportation in connection with out-of-town travel including customary Air Travel, Rail Travel, long distance voice, fax and data communications; and filing/administration fees paid for securing approval of authorities having jurisdiction over the Project. Travel reimbursement for mileage shall be made at the current IRS allowable rates. Bridge Tolls, road tolls, and parking fees are allowable reimbursable expenses.

D.  Expense of any perspective renderings, photography, models and mock-ups requested by Owner/Developer.

E.  Other reimbursable expenses: _____

All reimbursable expenses shall be paid at actual costs with no mark-up and supported by invoices and expense statements. All other expenses such as but not limited to Long Distance Telephone, Cell Phones, and Blackberry charges shall be considered non-reimbursable unless previously approved in writing by Owner/Developer.

1 of 3



## Article 5 - SERVICES

### A. *Basic Scope*

1. Consultant shall devote the time, attention and energy necessary for the competent and effective performance of the Services, and Consultant shall use its best efforts to achieve Owner/Developer's objectives, including without limitation attending meetings with Owner/Developer, its employees and agents, coordinating activities with other persons working on the Project, handling and distributing communications relating to the Project, and making local telephone calls.

2. During the term of this Agreement, Consultant shall maintain the competence and skills commensurate with Consultant's responsibilities under this Agreement and as required by law.

3. Consultant shall promptly comply with and take all steps necessary to cause all analyses, drawings, designs, plans, specifications, studies and all other documents or instruments prepared or drafted under the terms of this Agreement to comply with all laws, statutes, ordinances and other governmental rules, regulations and requirements, including all amendments thereto, arising out of or relating to Consultant's performance of the Services, including but not limited to the Americans with Disabilities Act of 1990 and its implementing regulations and codes and state laws, regulations and codes relating to access for individuals with disabilities to public accommodations.

4. All Services performed hereunder by Consultant shall be subject to review and approval by Owner/Developer at intervals mutually agreed upon at the time of authorization to perform Services.

5. Consultant shall review alternative systems and approaches with Owner/Developer, prepare analyses, drawings and other documents, and make reasonable revisions to such documents. When necessary, Consultant shall consult with public agencies and other organizations concerning utility services and requirements.

6. Consultant shall recommend to Owner/Developer that appropriate investigations, surveys, tests, analyses and reports be obtained as necessary for the proper execution of Consultant's services.

7. Consultant shall ensure that documents contain appropriate information required for regulatory permitting and approvals, and shall assist Owner/Developer in filing all appropriate documents concerning the Project that are required for the approval of governmental authorities having jurisdiction over the Project.

8. At the end of the Project, Consultant will provide final construction documents with permit comments on Compact Disk ("CD") to Owner. The CD should be labeled with the type of project, project number, Branch name, full project address and Consultant's name, address and phone number. Final payment may be withheld contingent upon receipt of the CD.

### B. *Ethical Code of Conduct and Procurement Philosophy*

1. It is the intention of Owner/Developer that procurements will be made to the best advantage in the open market without favoritism. Best advantage is defined as the most favorable offer available in the competitive market considering prices, quality, performance and payment terms.

2. All employees of Owner/Developer involved in the procurement function are obliged under its "Code of Conduct" to perform business in an ethical manner, thus prohibiting them to accept any privileges, in fact or appearance, which might compromise their ability to execute a bona fide business transaction. Further, this prohibits them from seeking any improper advantage through contribution of funds, equipment or facilities or the provision of other gifts or benefits to public officials or political organizations. Specifically, no illegal or improper payment is to be made to any person or entity.

3. By execution of this Agreement, Consultant acknowledges awareness of Owner/Developer's "Code of Conduct" and procurement philosophy noted herein. Additionally, Consultant acknowledges its intention to cooperate fully with Owner/Developer in developing only ethical business relationships.

4. Should Consultant encounter any business activity in its efforts to establish a business relationship with Owner/Developer which suggests a violation of its philosophy, Consultant shall communicate such encounter to the Senior Vice President of Facilities.

## Article 6 - OWNER/DEVELOPER'S RESPONSIBILITIES

### A. *Information*

1. Owner/Developer shall provide sufficient information regarding requirements for the Project.

2. Owner/Developer shall furnish additional information and shall render approvals and decisions as expeditiously as necessary for the orderly process of the Services.

3. Owner/Developer shall make arrangements for Consultant to enter upon public and private lands as reasonably required for Consultant to perform the Services.

4. Owner/Developer shall provide all reasonable and customary construction administration services required for the Project, including Project scheduling, progress inspections, selection of contractors and subcontractors, monitoring and approval of progress, change order process and payment to subcontractors.

5. If Owner/Developer requires any changes in the Construction Documents, Owner/Developer shall provide necessary direction.

6. Notwithstanding the foregoing, Consultant shall be responsible for and certify compliance with all applicable laws, statutes, ordinances and other governmental rules, regulations and requirements, including all amendments thereto, arising out of or relating to Consultant's performance of the Services (including but not limited to the Americans with Disabilities Act of 1990 and its implementing regulations and codes, and state laws, regulations and codes relating to access for individuals with disabilities to public accommodations) and may not rely on information which it knows or should know in the exercise of Consultant's professional services, to be incorrect.

### B. *Owner/Developer Representative.* The individual(s) named below shall serve as Owner/Developer's authorized agent(s) and representative(s) for the purpose of this Agreement (individually or collectively, "Owner/Developer's Representative"):

Jon A. Sandeen
Name

SVP/Director of Development
Title

9000 Atrium Way
Address

Mount Laurel, NJ 08054
City, State, Zip Code

Owner/Developer's Representative shall:

1. Be responsible for clarifying the intent of Owner/Developer with respect to this Agreement or the Construction Documents;

2. Be responsible for the management of the Construction Documents, the Project, Consultant and Owner/Developer's agents, employees, contractors and other consultants working on the Project;

3. Periodically review Consultant's work;

4. Provide approvals and authorizations as required hereunder for Consultant to take certain actions; and

5. Review and approve Consultant's requests for payment. Unless Consultant receives written notice to the contrary from a Vice President or the President of Owner/Developer or its parent corporation, no person(s) other than the individual(s) designated herein as Owner/Developer's Representative shall be authorized to act on behalf of Owner/Developer with respect to this Agreement.

## Article 7 - COMPENSATION

### A. *Payments.* Consultant shall provide Owner/Developer with monthly invoices for services rendered. Owner/Developer shall pay Consultant within thirty (30) days after the receipt of each such invoice.

### B. *Payment on Termination.* Except for a termination of this Agreement due to the breach thereof by Consultant, Owner/Developer will pay for all costs and fees earned up to the date of termination within thirty (30) days after Consultant has delivered any and all documents prepared pursuant to this Agreement prior to the date of termination. The compensation earned by and to be paid to Consultant by Owner/Developer in lieu of the Fee described in Article 7A, shall be determined by Owner/Developer in its reasonable discretion taking into account the value to the Project of the Services provided by Consultant prior to the date of termination.

### C. *Offset.* Notwithstanding anything to the contrary contained in this Agreement, (i) Owner/Developer may reduce any payments due Consultant under this Agreement by amounts owed by Consultant to Owner/Developer or any Affiliate of Owner/Developer (as hereinafter defined) resulting from any contract or other agreement between Consultant and Owner/Developer and/or such Affiliate ("Affiliate Contract"), and/or (ii) Owner/Developer may reduce any payments due Consultant under any Affiliate Contract by amounts owed by Contractor to Owner/Developer under this Agreement. For purposes of this Agreement, an "Affiliate" shall be any entity controlling, controlled by or under common control with, Owner/Developer.

## Article 8 - THE INSTRUMENTS OF SERVICE

### A. All plans, designs, drawings, specifications, studies and other instruments of service produced for the Project by or on behalf of Consultant pursuant to this Agreement ("Instruments of Service") shall (i) contain all information necessary to obtain the requisite regulatory permits; (ii) conform to applicable laws, statutes,



ordinances, and governmental rules and regulations, including but not limited to the Americans with Disabilities Act of 1990 and its implementing regulations and codes, and state laws, regulations and codes relating to access for individuals with disabilities to public accommodations; (iii) be accurate and complete and meet generally accepted professional standards and principles; and (iv) be suitable for the intended purpose and use.

B.    Drawing size shall be 24" x 36" unless otherwise specified.

C.    Upon completion, one (1) copy of all Instruments of Service Shall be submitted to Owner/Developer's Representative.

D.    All Instruments of Service Shall be the sole property of Owner/Developer, and Owner/Developer is vested with all rights therein, whether created by law or in equity; provided that Consultant's designs, drawings or specifications may not be used by Owner/Developer for any other project unless Owner/Developer provides prior notice to Consultant and agrees to pay a reasonable fee for such use. Owner/Developer hereby waives any claim against Consultant and agrees to indemnify and hold Consultant harmless from any claim or liability for injury or loss arising from Owner/Developer's unauthorized reuse of Consultant's designs, drawings or specifications.

## Article 9 - THIRD PARTY CONSULTANTS

Consultant shall be responsible for the engagement of any third party consultants necessary for the completion of Consultant's services hereunder. All third party consultants shall be duly licensed in their respective field of specialization and shall perform services in accordance with accepted professional standards. Nothing in this proposal shall be deemed to create any contractual relationship between Owner/Developer and any individual, firm, or organization hired by Consultant.

## Article 10 - LIENS

Consultant shall pay all third party consultants and other subcontractors and material suppliers engaged by Consultant in a timely manner to prevent liens being filed with respect to the Site or the Project. If Owner/Developer receives a notice of claim of lien due to non-payment by Consultant, or if a lien is filed due to non-payment by Consultant, Consultant shall, within thirty (30) days after receipt of written notice, (a) resolve the claim or lien and provide Owner/Developer with a lien waiver or release in recordable form or (b) alternatively at Consultant's expense, post a bond satisfactory to Owner/Developer indemnifying Owner/Developer against any such lien. Should Consultant fail to secure such waiver/release or bond within such thirty (30) days, Owner/Developer may, without notice, procure the bond at Consultant's expense or resolve the claim and make payment directly or indirectly to the claimant and deduct same from any monies due to Consultant.

## Article 11 - INSURANCE

Prior to the commencement of the Service, Consultant shall at all times maintain the following insurance coverage from insurance companies that are licensed to do business in the state where the Project is located and have a General Rating of "A" or better as set forth in the most current issue of Best's Key Rating Insurance Guide:

A.    Worker's Compensation Insurance in accordance with applicable state requirements with a waiver of subrogation in favor of Owner/Developer;
B.    Errors and Omissions Insurance with limits not less than $2,000,000 combined single limit; and
C.    Such other insurance required by law, ordinance, rule or regulation.

Prior to commencement of Services, Consultant shall furnish Owner/Developer with Certificates of Insurance for each of the above insurance policies, providing, among other things, that Owner/Developer shall receive at least thirty (30) days prior written notice of any material change in, or cancellation of, such insurance.

If the consultant is working on Commerce premises, or is working on our behalf on the premises of others, they should provide evidence of Worker's Compensation Insurance and should also provide evidence of general liability insurance, naming Commerce Bank "additional insured." If they are driving vehicles while working for us, they should provide "additional insured" status to Commerce Bank.

## Article 12 - CONFIDENTIALITY

Consultant shall sign a Commerce Bancorp Confidentiality agreement.

## Article 13 - INDEMNITY

A.    Indemnification by Commerce Bank. - Per Addendum C - Agency Agreement dated January 15, 2002 Paragraph 5.

B.    Indemnification by InterArch. - Per Addendum C - Agency Agreement dated January 15, 2002 Paragraph 6.

C.    Notification of Claim. Per Addendum C - Agency Agreement dated January 15, 2002 Paragraph 7.

D.    Survival. Per Addendum C - Agency Agreement dated January 15, 2002 Paragraph 8.

## Article 14 - TERMINATION

A.    Per Addendum C - Agency Agreement dated January 15, 2002 Paragraph 11

## Article 15 - CONSULTANT'S RECORDS

A.    Consultant shall maintain full and accurate records of all accounts of time and costs incurred in connection with this Agreement, including without limitation the Services, Additional Services and Reimbursable Expenses.

B.    Owner/Developer shall have the right to inspect and copy, with Consultant's assistance and cooperation, Consultant's books and financial records pertaining to Owner/Developer, the Services or Consultant's financial condition.

## Article 16 - RELATIONSHIP OF PARTIES

Consultant is an independent contractor with respect to the Services performed hereunder. Nothing contained herein shall be deemed to create the relationship of partner principal, or joint venture between the parties. Consultant has no right or authority to incur obligations of any kind in the name of or for the account of Owner/Developer nor to commit or bind Owner/Developer to any contract or other obligation.

## Article 17 - NOTICES

All notices to be delivered under this Agreement shall be in writing, signed by the parties serving same and delivered personally or by registered or certified U.S. Mail postage prepaid, or by reputable private delivery service postage prepaid and providing a receipt to sender. Each such notice shall be deemed delivered upon actual delivery or refusal.

Notices shall be addressed as follows:

To Owner/Developer:    Commerce Bancorp, Inc.
Street Address:    1701 Route 70 East
City/State/Zip:    Cherry Hill, New Jersey 08034
Attn:    President

To Consultant:    InterArch, Inc.
Street Address:    11000 Atrium Way
City/State/Zip:    Mount Laurel, NJ 08054
Attn:    President

## Article 18 - MISCELLANEOUS PROVISIONS

A.    This Agreement shall be governed by and construed in accordance with the laws of the state wherein the Project is located.

B.    Failure or delay on the part of either party to exercise any right, power, privilege or remedy under this Agreement shall not constitute a waiver thereof.

C.    No modification or waiver by either party of any provision of this Agreement shall be deemed to have been made unless made in writing and signed by the parties.

D.    The provisions of this Agreement shall be severable and the invalidity of any provision, or portion thereof, shall not affect the enforceability of the remaining provisions.

E.    Neither party shall assign or transfer any interest in this Agreement.

F.    Consultant hereby warrants and represents that Consultant does not and will not during the course of the Project discriminate against any employee or applicant for employment based on race, color, sex, national origin, religion, age, handicap or other unlawful basis.

G.    This Agreement shall be binding on, and inure to the benefit of, the respective parties successors and assigns.

IN WITNESS WHEREOF, Owner/Developer and Consultant through their duly authorized signatories have executed this Agreement as set forth below.

OWNER/DEVELOPER                          CONSULTANT

By: _____                      By: _INTERARCH_

Name: _JON SANPHEN_                      Name: _SHIRLEY HILL_

Title: _SVP, Dir. of Dev_                Title: _PRES._

Date: _3/2/06_                           Date: _2·27·06_

856.439 9000 • FAX: 856.439 9005
IA@SSH-INC.COM

*" Addendum A " 1 of 2*

September 29, 2005

Mr. Jon A. Sandeen
SVP/Director of Development
Commerce Bank, N.A.
9000 Atrium Way
Mt. Laurel, NJ  08054

RE:  Computer Aided Facilities
     Management

Dear Mr. Sandeen:

InterArch has been reviewing with Commerce Bank for some time the methodology by which InterArch, on behalf of Commerce, manages the space planning, moves, adds and changes of personnel throughout the Commerce facilities primarily in the non-retail areas.  This process is now being handled by InterArch on a manual basis under our present Services Agreement.

We and Commerce have agreed that it is appropriate for Commerce to move to the next stage in this area by acquiring and operating a Computer Aided Facilities Management program (CAFM).  This program will provide a current database of all facilities and personnel locations and will allow both Commerce and InterArch to more easily access this information and manage the never-ending changes.

Commerce has decided to purchase a Computer Aided Facilities Management program provided by FM Systems and has asked InterArch to provide a proposal to implement, operate and maintain the CAFM system for Commerce.

InterArch proposes to operate this new system as follows:

1.   Scope

Development, for approval by Commerce, of a comprehensive scope of what will be included in the database and how it will be used.

Interior D███████itecture

Mr. Jon A. Sandeen
Page Two
September 22, 2005

"Addendum A" 2 of 2

2.    Implement

InterArch, on behalf of Commerce, will load facilities and personnel information for all locations into the database and bring it to a current status.

3.    Management

InterArch, on behalf of Commerce, will maintain the site on a current basis by updating the information weekly with all moves, adds and changes. Further, all new facilities as they come online will be added to the database.

4.    Design

Information in this database will be used by both InterArch and Commerce to design and manage existing and future facilities.

5.    Access

Designated people at Commerce and InterArch will have real time access to the system. The system will remain the property of Commerce.

Pursuant to our existing Fee for Services Contract, InterArch proposes to implement this proposal as follows:

1.    The creation of the database, including bringing it to a current status, will be billed by InterArch on an hourly basis.

2.    InterArch will operate and maintain the system on an ongoing basis at a fixed monthly fee of $10,000 per month, beginning January 1, 2006. InterArch will be adding additional staff to implement this proposal.

Thank you for the opportunity to provide these services.

Very truly yours,

Shirley Hill
President

Space Pl_____ior Design

INTERARCH

11000 Atrium Way • Suite 100
Mount Laurel, NJ 08054

856.439.9000 • FAX: 856.439.9005
IA@SSH-INC.COM

"Addendum B" 1 of 4

December 9, 2005

Mr. Jon A. Sandeen
SVP/Director of Development
Commerce Bank, N.A.
9000 Atrium Way
Mt. Laurel, NJ  08054

Dear Mr. Sandeen:

It is an honor to be asked to present our upcoming contract. As in the past, we have valued the opportunity to look for efficiencies and cost saving for Commerce.

Enclosed is our proposed 2006 Rate Schedule. There are no hourly rate increases.

Going forward I will no longer bill the bank for my services.

This proposal will be an amendment to our existing contract. We believe these changes represent a 5+/-% cost reduction.

Thank you in advance for your consideration of the enclosed.

Sincerely,

Shirley Hill
President


Interior Design and Architecture

INTERARCH

11000 Atrium Way • Suite 100
Mount Laurel, NJ 08054

856.439.9000 • FAX: 856.439.9005
IA@SSH-INC.COM

"Addendum B" 2 of 4

December 9, 2005

Mr. Jon A. Sandeen
SVP/Director of Development
Commerce Bank, N.A.
9000 Atrium Way
Mt. Laurel, NJ  08054

RE: Proposal for Services

Dear Mr. Sandeen:

I am pleased to enclose our Proposal for architectural and interior design services, landscape design, construction management, facilities consulting and Computer Aided Facilities Management to Commerce Bancorp, Inc. to commence January 1, 2006 through December 31, 2006.

1.   **Store Plan**

     A: Maintenance and use of each new prototype store     **$5,000.00**

     B: Interior design of each new prototype store     **$5,000.00**

     C: Interior renovation plan of prototype store     **Hourly**

     D: Interior renovation plans for non-prototype store     **Hourly**

2.   **Interior Design Services**

     Services will be provided for non-prototype branch interior design on an hourly fee basis based on the hourly schedule attached.

3.   **Architectural Services**

     Architectural services will be provided on an hourly fee basis based on the hourly schedule attached.



Interior Design and Architecture

Mr. Jon Sandeen
December 9, 2005
Page 2

"Addendum B" 3 of 4

4. **Landscape Architectural Services**

Landscape Architectural services will be provided on an hourly fee basis based on the hourly schedule attached.

5. **Construction Management**

Services will be provided on an hourly basis based on the hourly schedule attached.

6. **Facilities Consulting Services**

Services will be provided on an hourly basis based on the hourly schedule attached.

7. **Computer Aided Facilities Management (CAFM) Services**

A. The creation of the CAFM database, including bringing it to a current status, will be billed by InterArch on an hourly basis based on the hourly schedule attached.

B. InterArch will operate and maintain the system on an ongoing basis at a fixed monthly fee of $10,000 per month.

C. There will be no hourly billing for my time unless you have provided prior approval.

Thank you in advance for your consideration of this proposal. We value and look forward to your continued growth.

Sincerely,

Shirley Hill
President


Space Planning and Interior Design

" Addendum B "   4 of 4

## 2006
## INTERARCH
## RATE SCHEDULE

| <u>Title</u> | <u>Rate</u> |
|---|---|
| President | $200.00 (waived) |
| Principal/Director | $150.00 |
| Team Leader | $130.00 |
| Senior Construction Manager | $120.00 |
| Senior Project Architect/Designer | $110.00 |
| Senior Project Manager | $110.00 |
| Senior Landscape Architect | $110.00 |
| Project/Construction Manager | $90.00 |
| Senior Architect/Senior Designer | $75.00 |
| Landscape Architect | $75.00 |
| Graphic Designer | $75.00 |
| Architect/Project Manager | $65.00 |
| Designer | $65.00 |
| Project Designer | $60.00 |
| Facilities Coordinator | $55.00 |
| Support Staff | $37.00 |

Space Planning and Interior Design

"Addendum C" 1 of 4

## AGENCY AGREEMENT

THIS AGENCY AGREEMENT ("Agreement") is entered into this 15th day of January, 2002, by and between COMMERCE BANCORP, INC., a New Jersey corporation with a business address of 1701 Route 70 East, Cherry Hill, New Jersey 08034 ("Commerce", for purposes of this Agreement, "Commerce" shall be deemed to include all subsidiaries of Commerce) and INTERARCH, INC. a New Jersey corporation with a business address of 11000 Atrium Way, Suite 100, Mount Laurel, New Jersey 08054 ("InterArch").

## BACKGROUND

InterArch has provided to, and the parties hereto desire InterArch to continue to provide to, Commerce and its subsidiaries various services, including without limitation, project administration and management services, planning and evaluation services, design services, construction procurement services, bidding and negotiation services, contract administration services and the procurement of furniture, fixtures, artwork and equipment (collectively the "Services").

The parties hereto desire to memorialize certain terms and conditions by which their relationship has been governed and by which they desire their relationship to continue to be governed.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants contained herein, and other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, and intending to be bound hereby, the parties hereto agree as follows:

1.    <u>Definition.</u>    For purposes of this Agreement, the term "Project" shall mean any specific work for which Commerce desires any of the Services offered by InterArch during the term hereof. Project shall be deemed to include all Projects undertaken by InterArch for Commerce during the term hereof and all Projects either completed and/or started by InterArch prior to the date hereof.

2.    <u>Other Terms.</u>    The specific Services required of InterArch by Commerce for any individual Project as well as the specific compensation and other terms and conditions shall be set forth in a separate agreement signed by both parties hereto; it being agreed that the terms set forth in this Agreement shall be deemed a part of any such separate agreement.

3.    <u>Agency Designation.</u>    Commerce hereby designates InterArch as its agent for purposes of Projects and InterArch hereby accepts such designation as Commerce's agent hereunder. InterArch shall be a representative of and shall advise and consult with Commerce (1) during planning and construction, and until final payment to the contractors is due, and (2) as an additional service at the Owner's discretion from time to time during the correction period described in the contracts for construction. InterArch shall have authority to act on behalf of Commerce only to the extent provided in this Agreement unless otherwise agreed to.

4.    <u>Duties and Responsibilities.</u>    As agent hereunder, InterArch will be entitled to rely upon any instructions or directions furnished to it by any officer or other representative designated as such by Commerce and to apply to such individuals for directions or instructions in

"Addendum C" 2 of 4

connection with its duties, and will be entitled to treat as genuine, and as the document it purports to be, any letter or other document furnished to it by such individuals. InterArch shall incur no liability or responsibility to Commerce or any third party for any action taken in reliance on, and in accordance with, any such instruction, direction, notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument which conforms to the applicable requirements of this Agreement and which is reasonably believed by InterArch to be genuine and to have been signed, delivered, given or authorized by the proper party or parties.

5.     Indemnification by Commerce.  Commerce shall fully indemnify InterArch against, and defend and hold it, its officers, directors, employees, agents and other representatives harmless from any and all liability and related expenses (including without limitation reasonable fees and expenses of its counsel) incurred by InterArch and its officers, directors, employees, agents and other representatives, which may arise out of acts performed or omitted in connection with Projects and this Agreement (i) by InterArch, its officers, directors, employees, agents and other representatives, except to the extent such liability or expense arises out if its or their own gross negligence or willful misconduct, or (ii) by Commerce or any of its officers, directors, employees, agents or other representatives.

6.     Indemnification by InterArch.  InterArch shall fully indemnify Commerce against, and defend and hold it, its officers, directors, employees, agents, and other representatives harmless from, any and all liability and related expenses (including without limitation reasonable fees and expenses of its counsel) incurred by Commerce and its officers, directors, employees, agents and other representatives, which may arise out of acts performed or omitted by InterArch in connection with Projects and this Agreement due to InterArch's or its officers, directors, employees, agents or other representatives own gross negligence or willful misconduct.

7.     Notification of Claim.  If any action or claim shall be brought or threatened to be brought against a party in respect of which indemnity may be sought pursuant hereto, such party shall, as soon as practicable (or, in the case of any action or claim which is threatened to be brought, as soon as practicable after such party actually becomes aware of the same) notify the party against whom indemnity may be sought in writing of such action or claim, and the circumstances thereof.  In the event of any action or claim being brought or threatened to be brought against such party for which indemnification hereunder may be sought, each of the parties hereto shall provide to the other party hereto such information and assistance as such party shall reasonably request.  Each party shall to the extent reasonable and practicable in all circumstances fully cooperate with and consult with the other party as and when reasonably requested by such party in respect of any action or claim referred to herein.

8.     Survival.  The obligations set forth in Paragraphs 5, 6 and 7 shall survive any termination of this Agreement.

9.     Amendments.  This Agreement may be amended, supplemented or otherwise modified only by a written instrument executed and delivered by each of the parties hereto.

10.     Governing Law and Jurisdiction.  This Agreement will be governed by, and construed and interpreted in accordance with, the laws of the State of New Jersey applicable to

"Addendum C"  3 of 4

contracts entered into, and to be fully performed, in the State of New Jersey. In order to enforce the provisions of Section 18 hereof, the parties agree that the federal and state courts located in the County of Camden, State of New Jersey, shall have exclusive jurisdiction to hear and determine any suits, actions or proceedings and to settle any disputes between the parties relating to this Agreement and for such purpose each of the parties irrevocably submits to the jurisdiction of such courts. The provisions of this Paragraph 10 shall survive any termination of this Agreement.

11.    Termination.  This Agreement shall be subject to the annual approval of the Commerce Board(s); provided, however, that this Agreement may be terminated by either party upon not less than sixty days' written notice (the "Notice Period") should the other party fail to materially perform in accordance with the terms of this Agreement and fails to cure such failure to perform within the Notice Period.

12.    Counterparts.  This Agreement may be executed by the parties hereto on separate counterparts, which counterparts taken together will be deemed to constitute one and the same instrument.

13.    Notices.  Any notice provided for herein must be in writing and shall be deemed given when received and shall be addressed as follows: (i) if to Commerce, to Commerce Bancorp, Inc., 1701 Route 70 East, Cherry Hill, New Jersey 08034, Attn:  President, and (ii) if to InterArch to InterArch, Inc., 11000 Atrium Way, Suite 100, Mount Laurel, New Jersey 08054, Attn:  President.  A party may, by notice given in writing to the other party at its above address, designate another address for receipt of notices hereunder.

14.    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

15.    Severability.  In case any one or more of the provisions contained in this Agreement should be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall in no way be affected, prejudiced or disturbed thereby.

16.    Assignment.  InterArch may not assign this Agreement, or any of its rights or obligations under this Agreement, whether by operation of law or otherwise, without the prior written consent of Commerce.

17.    No Third Party Rights.  Nothing contained in this Agreement or referred to in this Agreement is intended, or shall be construed, to give to any person or other entity other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors and permitted assigns.

18.    Arbitration.

(a)    Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and

Addendum C   4 of 4

decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise.

      (b)    Demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of limitations.

      (c)    The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon in accordance with applicable law in any court having jurisdiction thereof.

      IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

**Commerce Bancorp, Inc.**

By: _____

Name: _____ Douglas J. Pauls

Title: ___CFO_____

**InterArch, Inc.**

By: _____

Name: __Shirley Hill_____

Title: __President_____

Exhibit C

# AGENCY AGREEMENT

THIS AGENCY AGREEMENT ("Agreement") is entered into this 15th day of January, 2002, by and between COMMERCE BANCORP, INC., a New Jersey corporation with a business address of 1701 Route 70 East, Cherry Hill, New Jersey 08034 ("Commerce", for purposes of this Agreement, "Commerce" shall be deemed to include all subsidiaries of Commerce) and INTERARCH, INC. a New Jersey corporation with a business address of 11000 Atrium Way, Suite 100, Mount Laurel, New Jersey 08054 ("InterArch").

## BACKGROUND

InterArch has provided to, and the parties hereto desire InterArch to continue to provide to, Commerce and its subsidiaries various services, including without limitation, project administration and management services, planning and evaluation services, design services, construction procurement services, bidding and negotiation services, contract administration services and the procurement of furniture, fixtures, artwork and equipment (collectively the "Services").

The parties hereto desire to memorialize certain terms and conditions by which their relationship has been governed and by which they desire their relationship to continue to be governed.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants contained herein, and other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, and intending to be bound hereby, the parties hereto agree as follows:

1.    Definition.    For purposes of this Agreement, the term "Project" shall mean any specific work for which Commerce desires any of the Services offered by InterArch during the term hereof. Project shall be deemed to include all Projects undertaken by InterArch for Commerce during the term hereof and all Projects either completed and/or started by InterArch prior to the date hereof.

2.    Other Terms.    The specific Services required of InterArch by Commerce for any individual Project as well as the specific compensation and other terms and conditions shall be set forth in a separate agreement signed by both parties hereto; it being agreed that the terms set forth in this Agreement shall be deemed a part of any such separate agreement.

3.    Agency Designation.    Commerce hereby designates InterArch as its agent for purposes of Projects and InterArch hereby accepts such designation as Commerce's agent hereunder. InterArch shall be a representative of and shall advise and consult with Commerce (1) during planning and construction, and until final payment to the contractors is due, and (2) as an additional service at the Owner's discretion from time to time during the correction period described in the contracts for construction. InterArch shall have authority to act on behalf of Commerce only to the extent provided in this Agreement unless otherwise agreed to.

4.    Duties and Responsibilities.    As agent hereunder, InterArch will be entitled to rely upon any instructions or directions furnished to it by any officer or other representative designated as such by Commerce and to apply to such individuals for directions or instructions in

connection with its duties, and will be entitled to treat as genuine, and as the document it purports to be, any letter or other document furnished to it by such individuals. InterArch shall incur no liability or responsibility to Commerce or any third party for any action taken in reliance on, and in accordance with, any such instruction, direction, notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument which conforms to the applicable requirements of this Agreement and which is reasonably believed by InterArch to be genuine and to have been signed, delivered, given or authorized by the proper party or parties.

5.     Indemnification by Commerce.  Commerce shall fully indemnify InterArch against, and defend and hold it, its officers, directors, employees, agents and other representatives harmless from any and all liability and related expenses (including without limitation reasonable fees and expenses of its counsel) incurred by InterArch and its officers, directors, employees, agents and other representatives, which may arise out of acts performed or omitted in connection with Projects and this Agreement (i) by InterArch, its officers, directors, employees, agents and other representatives, except to the extent such liability or expense arises out if its or their own gross negligence or willful misconduct, or (ii) by Commerce or any of its officers, directors, employees, agents or other representatives.

6.     Indemnification by InterArch.  InterArch shall fully indemnify Commerce against, and defend and hold it, its officers, directors, employees, agents, and other representatives harmless from, any and all liability and related expenses (including without limitation reasonable fees and expenses of its counsel) incurred by Commerce and its officers, directors, employees, agents and other representatives, which may arise out of acts performed or omitted by InterArch in connection with Projects and this Agreement due to InterArch's or its officers, directors, employees, agents or other representatives own gross negligence or willful misconduct.

7.     Notification of Claim.  If any action or claim shall be brought or threatened to be brought against a party in respect of which indemnity may be sought pursuant hereto, such party shall, as soon as practicable (or, in the case of any action or claim which is threatened to be brought, as soon as practicable after such party actually becomes aware of the same) notify the party against whom indemnity may be sought in writing of such action or claim, and the circumstances thereof.  In the event of any action or claim being brought or threatened to be brought against such party for which indemnification hereunder may be sought, each of the parties hereto shall provide to the other party hereto such information and assistance as such party shall reasonably request.  Each party shall to the extent reasonable and practicable in all circumstances fully cooperate with and consult with the other party as and when reasonably requested by such party in respect of any action or claim referred to herein.

8.     Survival.  The obligations set forth in Paragraphs 5, 6 and 7 shall survive any termination of this Agreement.

9.     Amendments.  This Agreement may be amended, supplemented or otherwise modified only by a written instrument executed and delivered by each of the parties hereto.

10.     Governing Law and Jurisdiction.  This Agreement will be governed by, and construed and interpreted in accordance with, the laws of the State of New Jersey applicable to

contracts entered into, and to be fully performed, in the State of New Jersey. In order to enforce the provisions of Section 18 hereof, the parties agree that the federal and state courts located in the County of Camden, State of New Jersey, shall have exclusive jurisdiction to hear and determine any suits, actions or proceedings and to settle any disputes between the parties relating to this Agreement and for such purpose each of the parties irrevocably submits to the jurisdiction of such courts. The provisions of this Paragraph 10 shall survive any termination of this Agreement.

11.    Termination.  This Agreement shall be subject to the annual approval of the Commerce Board(s); provided, however, that this Agreement may be terminated by either party upon not less than sixty days' written notice (the "Notice Period") should the other party fail to materially perform in accordance with the terms of this Agreement and fails to cure such failure to perform within the Notice Period.

12.    Counterparts.  This Agreement may be executed by the parties hereto on separate counterparts, which counterparts taken together will be deemed to constitute one and the same instrument.

13.    Notices.  Any notice provided for herein must be in writing and shall be deemed given when received and shall be addressed as follows: (i) if to Commerce, to Commerce Bancorp, Inc., 1701 Route 70 East, Cherry Hill, New Jersey 08034, Attn: President, and (ii) if to InterArch to InterArch, Inc., 11000 Atrium Way, Suite 100, Mount Laurel, New Jersey 08054, Attn: President. A party may, by notice given in writing to the other party at its above address, designate another address for receipt of notices hereunder.

14.    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

15.    Severability.  In case any one or more of the provisions contained in this Agreement should be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall in no way be affected, prejudiced or disturbed thereby.

16.    Assignment.  InterArch may not assign this Agreement, or any of its rights or obligations under this Agreement, whether by operation of law or otherwise, without the prior written consent of Commerce.

17.    No Third Party Rights.  Nothing contained in this Agreement or referred to in this Agreement is intended, or shall be construed, to give to any person or other entity other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors and permitted assigns.

18.    Arbitration.

(a)    Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and

decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise.

(b)    Demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of limitations.

(c)    The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon in accordance with applicable law in any court having jurisdiction thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

Commerce Bancorp, Inc.

By: _____

Name: ____Douglas J. Pauls____

Title: ____CFO____

InterArch, Inc.

By: _____

Name: ____Shirley Hill____

Title: ____President____